**UNITED STATES of America**

v.

**Robert GRANT and George Lawrence, Defendants.**

No. 76 CR. 762.

United States District Court, S. D. New York.

Oct. 15, 1976.

Robert B. Fiske, Jr., U. S. Atty., Peter Bloch, Asst. U. S. Atty., New York City, for plaintiff.

Joseph I. Stone, P. C., New York City, for defendant Grant.

Howard L. Jacobs, New York City, for defendant Lawrence.

## MEMORANDUM AND ORDER

ROBERT L. TAYLOR, District Judge.*

Robert Grant and George Lawrence are charged in the first fifteen counts of a sixteen-count indictment with unlawfully, wilfully and knowingly having in their possession the contents of certain check-letters stolen from the United States Mail, knowing the same to have been stolen. In the sixteenth count they are charged with unlawfully, wilfully and knowingly forging the endorsement of the payee, Freddie Mitchell, on the back of a check, for the purpose of obtaining from the United States Government a sum of money, the check being a genuine obligation of the United States.

Each defendant has moved to suppress all evidence seized by the Government agents claiming that such seizure was in violation of the Fourth Amendment to the United States Constitution and Rule 41 of the Federal Rules of Criminal Procedure. Defend-

ants also seek to have suppressed certain statements made by them to the Government officers while under arrest. The motions are supported by an affidavit of each defendant.

## I. THE EVIDENCE

At the hearing on this motion, Agent Quinn, both defendants, and a U. S. Postal Inspector testified as to the events occurring on August 3, 1976. Agent Quinn's testimony may be summarized as follows. On August 3, 1976, he was in the process of training Agent Dougherty.[1] He had taken Agent Dougherty to Playland Arcade on West 42nd Street to show him where false identification cards were often purchased for use in cashing stolen government checks. Agent Quinn testified that in the last three years he had been involved in "no less than 25 cases" involving stolen government checks in which the false identification cards were purchased at Playland Arcade. Agent Quinn also added that he had made at least 400 arrests for stolen government checks in his seven years as a Secret Service Agent.

At approximately 2:45 p. m., while standing some twenty feet from the counter where facsimile social security cards were sold, Agent Quinn observed two young men approach the counter. One of the men, later identified as defendant Grant, purchased two facsimile social security cards. On cross-examination, Agent Quinn demonstrated extremely accurate vision when confronted with four small cards at a distance equal to that from which he observed the purchase of the facsimile social security cards. Quinn also observed that defendant Lawrence had a bulky package under his right arm.[2] As the defendants left Playland, the agents followed them, at first

---

* Judge Robert L. Taylor of the United States District Court for the Eastern District of Tennessee is sitting by designation.

1. Agent Quinn referred to August 3rd, or the 3rd of any month, as "check day." He explained that it was on this day of each month that the Treasury Department issues Social Security checks. The preceding day, August 2nd, was the day on which Supplemental Security Income checks were issued by the government.

2. The "package" was a brown paper bag folded in half, covered with a folded copy of a newspaper.

closely, gradually dropping back to about 35 feet, so as to arouse less suspicion of the defendants.

At some point, as the defendants walked up the west side of Seventh Avenue, defendant Lawrence shifted the package so that he was holding it with his right hand underneath the package. As they proceeded up Seventh Avenue, the agents began to close the gap between themselves and the defendants. At some point between 42nd and 43rd Street, Agent Quinn observed something sticking out of a hole in the rear of the package which appeared to him to be a Polaroid camera of the type often used to take pictures for false identification cards.[3]

As the agents began to follow closer to the defendants, Quinn observed about a one-half inch by three-quarter inch portion of what appeared to him to be a U. S. Treasury check.[4] A few moments later, he also noticed that portions of two "brown manila envelopes" were sticking out of the hole in the package, and that these envelopes appeared to be of the same color used to mail U. S. Treasury checks.

When the defendants had to stop at 45th Street for traffic, the agents came to within approximately five feet of them. Quinn said he then confirmed that the green object was indeed the corner of a Treasury check.[5]

While standing behind the defendants at this close proximity, Quinn observed that defendant Lawrence turned his head to the left and apparently caught a glimpse of Agent Dougherty. Quinn said defendant Lawrence then "stiffened" and "shuddered" upon the apparent recognition that he and defendant Grant were being followed.

As the defendants started to cross 45th Street, Quinn went around them on their right, held his badge in front and between the two defendants, giving them time to read the inscription. He then requested the defendants to "please pull over" at the corner because he would "like to talk to them." Both agents were in plain clothes, and no weapons were exhibited.

Quinn then asked Grant if he had just purchased some identification cards at Playland. Grant, after hesitation, responded affirmatively. Quinn asked Grant what he intended to do with the cards, and, after hesitation, Grant said they were for his own use. Quinn then asked Lawrence, "Could I see what you have in that package?" Lawrence handed over the package, and Quinn immediately placed it on the sidewalk and crouched down over it to examine the contents. Quick scrutiny of the contents revealed many items, including the following: several commercial and government checks; many pieces of identification; photographs of both defendants of the type generally used on identification cards; various envelopes, one of considerable bulk labeled "Jursey [sic] checks"; and an electronic calculator.[6]

The agents immediately arrested and handcuffed the defendants. The bag was seized.[7] Personal search of defendants turned up an additional commercial check on Lawrence and false identification on both defendants. Defendants later gave inculpatory statements to agents.

Both Quinn and the Postal Inspector testified that Grant, during the time of questioning, appeared alert, responsive, and in

3. Quinn stated he saw a part of a black and silver object, which he thought was a camera. He was about 20 feet behind defendants at this point. Quinn stated that Polaroid cameras were often used to make quick pictures to attach to forged identification.

4. On cross-examination, Quinn said his primary reason for reaching this conclusion was that the object observed had that distinctive shade of green associated with U. S. Treasury checks, which he called "government check green."

5. The Government's brief adds that not only are U. S. Treasury checks of a distinctive color, but have rounded corners, making them somewhat unique documents.

6. This was the black and silver object which Quinn thought was a Polaroid camera.

7. It was found to contain about 22 commercial checks, 29 U.S. Treasury checks, and 42 pieces of identification.

command of his senses, revealing no symptoms of being under the influence of drugs.[8]

On cross-examination, Quinn stated that at no time prior to the examination of the bag did he intend to arrest either defendant; that their path was not blocked, and they could have walked away at any time.

According to Agent Quinn, the defendants were arrested at about 3:00 p. m. They were taken to an office and questioned until approximately 7:00 p. m.

Defendant Lawrence's testimony may be summarized as follows. He never entered Playland, but met defendant Grant outside and walked up 7th Avenue. At some point on their walk, the agents ran up to them, exhibited a badge, and "threw us up against the wall." Quinn asked Grant something, which Lawrence didn't hear. Quinn then asked Lawrence what he had in the bag, and when he (Lawrence) failed to answer, Quinn "took the bag" from him. The agents then arrested and handcuffed the defendant. Lawrence then added that the bag had no hole in it then.[9]

On cross-examination, the United States Attorney brought out inconsistencies in Lawrence's testimony and his signed affidavit. Lawrence also admitted the prior use of three false names when dealing with law enforcement officials. Counsel stipulated that Lawrence once pleaded guilty to a charge of conspiracy to make false statements to a firearms dealer in the Eastern District of New York.

Defendant Grant's testimony focused primarily on his claim that his confession was involuntary due to his being under the influence of narcotics. He did affirm that he was arrested very soon after being shown a badge and that Quinn "took the bag" from Lawrence.

He claims that he was coerced into the confession because Quinn told him the longer he waited to confess, the longer it would be before he could get to the Metropolitan Correctional Center to see a doctor for his alleged withdrawal pains. He added that his primary symptom was being "unbearably cold" and that he not only informed Quinn of his discomfort and requested coffee, but that he was "shivering."

On cross-examination, the United States Attorney asked Grant if he knew what he was doing during the questioning to which he responded, "Yes." He also affirmed that he was articulating well that afternoon. He then added that he was "nervous," suffered from "undue coldness" and was "nauseated."

Based on all the evidence before the Court, and after carefully observing the demeanor and weighing the credibility of the conflicting testimony, the Court finds that Quinn's testimony was an accurate account of the facts concerning the events in question which occurred August 3, 1976.

## II. INVESTIGATIVE STOP

The standard for determining when an "investigative stop" of private citizens is proper was first articulated in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), as follows:

"Would the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?" 392 U.S. 1, at 21–22, 88 S.Ct. 1868, at 1880.

While this standard hardly provides a definitive guideline for judging police conduct,[10] we are of the opinion this "reasonableness" standard has been met here. Judge Friendly, in *United States v.*

---

8. Quinn stated he had seen at least twenty persons under the influence of drugs, and described many symptoms of such condition, none of which the defendant exhibited.

9. The bag, as introduced into evidence, did have a hole in one corner of several inches in diameter. Agent Quinn testified the hole was the same size as when the bag was carried by Lawrence.

10. *See generally*, J. Cook, *Constitutional Rights of the Accused, Pre-Trial Rights*, § 7 (1972).

*Santana,*[11] described this test as a "rather lenient" one.

We delineate the following factors, all observed by Agent Quinn prior to his request that defendants stop, and find them, taken as a whole, sufficient grounds for an agent with Quinn's experience to reach a reasonable suspicion that the defendants were engaging or preparing to engage in criminal activity.

(1) Observation of defendants in a location known to be a common source of false identification materials.[12]

(2) Observation of defendant Grant purchasing not one, but two facsimile social security cards.

(3) The above activity observed on a day known to be a prime time for activity in stolen checks.

(4) Observation of defendant Lawrence carrying a semi-disguised brown package with what appeared to be a Polaroid camera sticking out.

(5) Observation, within five feet, of portion of a U. S. Treasury check, and brown manila envelopes similar to those in which checks are mailed, both protruding from Lawrence's package.

(6) Observation of Lawrence's "stiffening" on apparent sighting of Agent Dougherty.[13]

The particular experience of Agent Quinn in cases involving stolen checks and specifically activity around Playland, is also a factor due some weight.[14]

Based on these factors, and the record as a whole, we hold that the agents had reasonable cause to stop defendants for investigative purposes.

## III. CONSENT TO SEARCH

In *Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973), the Supreme Court determined that the issue of "voluntariness" in an alleged consensual search, is an issue of fact. The Court refused to adopt the lower court's use of a "knowing and intelligent" waiver requirement.

On the facts of this case, it is to be noted that no weapons were exhibited, and no force applied in stopping defendants. We find and conclude that Lawrence's consent was voluntary, as opposed to one made under coercion or duress.

## IV. PROBABLE CAUSE TO ARREST

The test for arrest without a warrant is whether or not the facts available to the officers at the time of arrest would warrant a man of reasonable caution to believe that a crime had been committed. *Beck v. Ohio,* 379 U.S. 89, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964); *Carroll v. United States,* 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925).

After the defendants were stopped for questioning and after the agents examined the contents of Lawrence's bag pursuant to his consent, sufficient evidence was developed to establish probable cause for arrest without a warrant. *United States v. Watson,* 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976); *United States v. Robinson,* 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973). Many factors demonstrated probable cause to arrest both defendants upon examination of the contents of the bag.

Various types of identification cards were in the possession of the defendant Lawrence. Some of them were in the names of

---

11. 485 F.2d 365, 368 (2d Cir. 1973), *cert. den.,* 415 U.S. 931, 94 S.Ct. 1444, 39 L.Ed.2d 490.

12. *Cf. United States v. Hall,* 174 U.S.App.D.C. 13, 525 F.2d 857 (1976) (area associated with drug traffic); *United States v. Santana,* 485 F.2d 365 (2d Cir. 1973) (restaurant associated with narcotics trade).

13. *Cf. United States v. Hall,* 174 U.S.App.D.C. 13, 525 F.2d 857, 860 (1976).

14. *See United States v. Davis,* 147 U.S.App. D.C. 400, 458 F.2d 819 (1972); *United States v. Wabnik,* 444 F.2d 203 (2d Cir. 1971).

different people; some were blank. Detached pictures of the defendant Lawrence and defendant Grant and plastic coverings of the nature used to protect identification were found. All of this indicates that the defendants were in the business of collecting and manufacturing identification cards for the purpose of cashing stolen checks such as those found in their possession.

Freddie Mitchell's medical identification card which had been altered to fit the description of the defendants indicated defendants were planning to engage in a crime. A United States Treasury check for $53.89, made payable to Freddie Mitchell, was in the possession of defendants. They had in their possession other Government checks and the paraphernalia to match identification cards to them, and alteration of legitimate identification matching those checks was further evidence that defendants were engaged in check stealing.

Each case involving probable cause must stand on its own facts. *Wong Sun v. United States*, 371 U.S. 471, 479, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

### V. GRANT'S CONFESSION

■ While the use of narcotics and alcohol are valid factors in determining whether a confession was made "voluntarily," there are other equally important factors.[15] The question here focuses on the "due process" voluntariness standard, as it is not disputed that the proper *Miranda* warnings were given to Grant.

Confessions given while under the influence of drugs are not *per se* involuntary confessions.[16]

■ It appears from all the testimony · that defendant Grant's confession was given voluntarily and while he was under control of his senses and fully understood the consequences of his statements. In the opinion of the Court, he was not induced or coerced into giving these statements.

### VI. LAWRENCE'S CONFESSION

No testimony was heard on circumstances surrounding Lawrence's confession. We assume the motion to suppress his statements was based on the "fruit of the poisonous tree" doctrine. Since we have found no constitutional violations from which a "poisonous tree" could grow, it follows that the confession of Lawrence (and Grant) could not be fruit therefrom.

In the opinion of the Court, defendants' motions to suppress are not supported by the facts and the law and must be overruled.

Accordingly, it is ordered that each motion to suppress be, and the same hereby is, denied.

---

15. *See generally*, J. Cook, *Constitutional Rights of the Accused, Trial Rights*, § 73 (1974).

16. *Ortiz v. United States*, 318 F.2d 450 (9th Cir. 1963).