COMMONWEALTH *vs.* JOSEPH MEEHAN.

Suffolk. December 5, 1978. — March 19, 1979.

Present: HENNESSEY, C.J., BRAUCHER, KAPLAN, LIACOS, & ABRAMS, JJ.

*Constitutional Law,* Admissions and confessions, Search and seizure, Waiver of constitutional rights. *Search and Seizure. Arrest. Waiver.*

Evidence at a hearing on a motion to suppress warranted findings that the defendant was not under arrest but accompanied police officers to a station voluntarily when he was told the police were engaged in a general inquiry and were seeking cooperation and that an arrest did not take place until later when the police observed blood on his shoes and the defendant's explanation for the blood had been refuted. [557-559]

Evidence at a hearing on a motion to suppress was sufficient to warrant a finding that the defendant voluntarily surrendered his blood-stained shoes to the police. [559]

Where the defendant in a criminal case had voluntarily accompanied police officers to a station when he was told they were engaged in a general inquiry concerning a murder and were seeking coopera-

---

tion, the officers were entitled to seize the defendant's blood-stained shoes, which were in plain view, without a warrant [559-560]

At a hearing on a motion to suppress a confession evidence that the defendant, who was eighteen years old with a poor educational background, when arrested was not informed of his statutory right to call his family or friends, that his judgment was impaired through intoxication and that he confessed after being told that the case against him was established and after receiving assurance that the confession would assist his defense warranted a finding that his confession was involuntary and inadmissible. [560-568]

Evidence seized pursuant to a search warrant which was based on an involuntary confession was inadmissible at a criminal trial. [568-569]

Suppression of an inculpatory statement made by the defendant to family members following an involuntary confession to police was required where there were insufficient circumstances to insulate the statement from the confession. [569-571]

INDICTMENT found and returned in the Superior Court on August 11, 1976.

A motion to suppress evidence was heard by *Good*, J. Applications by the defendant and the Commonwealth for an interlocutory appeal were allowed by *Liacos*, J., and the appeal was reported by him.

*Sandra Hamlin*, Assistant District Attorney (*Paul A. Mishkin*, Special Assistant District Attorney, with her) for the Commonwealth.

*David A. Mills* (*Walter J. Hurley* with him) for the defendant.

KAPLAN, J. A Suffolk County grand jury handed up an indictment on August 11, 1976, charging the defendant Joseph Meehan with the murder of Maryann Birks. The defendant moved before trial to suppress inculpatory statements made by him as well as articles of clothing belonging to him. Extensive evidence was received on the voir dire, including testimony from the defendant and medical testimony dealing with the extent to which the defendant's perceptive ability was impaired when he made the statements. The judge filed lengthy findings which grounded his order granting the motion in part and denying it in part. Thereupon the Commonwealth

applied under G. L. c. 278, § 28E, for leave to take an interlocutory appeal from so much of the order as granted suppression, and the defendant made a similar application with respect to the denial. A single justice of this court granted both applications, and we are thus required to review the several parts of the order. The order will be affirmed except for one feature which in our view merits reversal.[1]

Drawing on the findings and the underlying record, we state some of the facts at this point, reserving the rest for the later discussion of particular issues.

About 6 A.M., Friday, June 11, 1976, police officers found the victim's body on the front lawn of 40 Oak Street in the Hyde Park neighborhood. The face and head were covered with blood; a large rock found near the body was spotted with blood. Promptly the police attempted to interview individuals living near 40 Oak Street, or known to have been at the nearby Cleary Square (evidently a familiar gathering place) on the previous night.

Of the former group, Mary Crowley, interviewed at her home on 38 Oak Street, said that about 2 A.M. that morning she was awakened by a scream, dogs barking, and a tapping sound; she heard a woman scream, "Don't. Please don't," and then a wordless scream. Crowley's daughter, Claire Wilde, staying at the same address, gave a similar account and added that, looking out the window, she saw a white male walk by the house; he was about five feet ten inches, in his mid-twenties, had dark hair, and was slender; he was wearing faded jeans and his shirtsleeves were rolled up. Some minutes later the man returned and she heard what she described as the sound of a large boulder being thrown on the lawn. She did not see the man's face. The statements of these two witnesses were recorded on tape.

---

[1] The defendant has not briefed or argued certain assignments of error and they are considered waived. S.J.C. Rule 1:13, as amended, 366 Mass. 853 (1974). See *Commonwealth* v. *Watkins*, 375 Mass. 472, 475 & n.2 (1978), and cases cited; Mass. R. A. P. 16, as amended, 367 Mass. 919 (1975).

Also on the morning of June 11, four persons of the Cleary Square group were interviewed at District 5 police station on Hyde Park Avenue. Two gave material statements, also tape-recorded. Joseph Ventola, who knew the victim, said that around midnight he had driven past her; she was on the steps of Christ Church at 1220 River Street in the company of a white man, shirtless, in his late teens, "skinny," with dark hair. The second witness, John Carroll, said that between 11:30 P.M. and midnight he had driven by the victim and the defendant Joseph Meehan (both known to him); they were sitting on the steps of Christ Church; he described Meehan as eighteen or nineteen years old, five feet six about 130 pounds, dark hair, wearing sneakers and a print shirt with rolled-up sleeves.

As Carroll was being interviewed about 10:30 A.M. in a first-floor room at the police station, he chanced, looking through the window near street level, to see the defendant trying to hitch a ride on Hyde Park Avenue and pointed him out to the police. Detective James Solari, one of the officers present, passed through the opened window to the street, while two other officers, William Cannon and Louis Russo, went by the front door. Russo walked up the street; Solari and Cannon proceeded in a police cruiser. The cruiser pulled up alongside the defendant. Cannon told him they were investigating an assault on a woman, were questioning those who had been seen in the area of the crime, and had been told that the defendant was there the previous evening. They asked the defendant to come with them to the station for an interview. The defendant said he was willing, but he was going to the unemployment office and did not want to be late. The officers answered they would drive him to the office if he should be delayed. The defendant opened the car door and took a rear seat, where he was joined by the officer who had approached on foot. The defendant was eighteen, five feet six inches, 135 pounds, dark hair, wearing cut-off dungarees and a blue print shirt with rolled-up sleeves.

Officer Solari interviewed the defendant at the station. Sitting at a short distance from the defendant, Solari noticed reddish stains on the defendant's sneakers. In response to a question, the defendant said they were probably mud. When Solar said they appeared to be blood, the defendant said, if so, the stains were from a fight he had had several days earlier with George Quish. Solari asked whether he could inspect the sneakers. The defendant answered by removing the left sneaker and handing it to Solari. Leaving the defendant in the room, Solari took the sneakers and showed them to Sergeant James Feeney. Feeney agreed there were blood stains. It happened that Quish was being interviewed at the station at the same time. When asked by Sergeant Feeney whether he had been involved in a fight recently, Quish said he had not been. Feeney then instructed Solari to arrest the defendant and give him Miranda warnings, which evidently was done (there was no proof as to the manner of administering the warnings). A chemical test, made promptly, confirmed the visual judgment of blood.

About 11:20 A.M., the defendant was passed on to Sergeant Joseph Kelley (with Officers Feeney, Mark Madden, and Russo also present). Kelley gave the defendant Miranda warnings, and then followed an interrogation, interlarded with cajolings and assurances, which continued for perhaps an hour (almost all recorded on tape). Starting with his denial that he had been in the company of the victim on the night of the assault, the defendant was gradually brought around to admitting that he had kicked her, thrown a rock at her, and left her unconscious (as he thought) at the place where she was found. The circumstances of this confession were dealt with by the judge in particular detail, and must be closely examined later in this opinion.

Mentioning the confession (and with some reference also to the statements of Claire Wilde and John Carroll previously given to the police), Officer Solari applied early that afternoon to the assistant clerk of the Municipal

Court of the West Roxbury District for a warrant to search the defendant's house at 1559 River Street and recover the dungarees he was wearing (as mentioned during the confession) at the time of the alleged assault. The dungarees were in fact recovered under the warrant, as was a pair of undershorts found during the search.

The defendant's mother and brother, with Sergeant Feeney present, visited him at his cell at the District 5 station around 3:45 P.M. According to Feeney's testimony (which differed from that of the relatives), the defendant then uttered an incriminatory remark.

The judge after voir dire held (1) there was not an arrest on Hyde Park Avenue; (2) the sneakers should not be suppressed; (3) the confession should be suppressed, (4) with like consequence for the dungarees and undershorts; and (5) the statement to the mother and brother should not be suppressed. The cross applications for interlocutory appeal followed.

In reviewing the judge's order we apply the standard recently stated, "that there is a presumption against waiver of constitutional rights, and, with regard to the attitude owed by the reviewing court to the trial judge who rules on a motion to suppress, that it is for that judge to resolve questions of credibility; that his subsidiary findings are to be respected if supported by the evidence; that his findings of ultimate fact deriving from the subsidiary findings are open to reexamination by this court, as are his conclusions of law, but, even so, that his conclusion as to waiver is entitled to substantial deference." *Commonwealth* v. *Doyle, ante* 132, 138 n.6 (1979). Adhering to that standard, we see no sufficient basis for interfering with the findings or conclusions of the judge below, except as to the statement to the mother and brother which, as matter of law, must be suppressed as the product of the original confession. We reverse that part of the order and affirm the rest.

1. *The arrest.* The defendant argues initially that he was arrested at 10:30 A.M. on Hyde Park Avenue, and

that there was not probable cause for an arrest at that time. If the arrest was thus illegal, he maintains, it would infect the sequelae. The Commonwealth contends, and the judge found, that there was no arrest on Hyde Park Avenue, that an arrest did not take place until about 11:15 A.M., after the sneakers appeared on inspection to be bloodied and Quish had denied the fighting. The defendant does not challenge the judge's finding that there was sufficient cause for an arrest at that time.

The judge's conclusion that the defendant accompanied the officers voluntarily, and not under constraint, is well supported. It was put to the defendant that the police were engaged in a general inquiry and were seeking cooperation: the officers asked, did not demand, that the defendant come with them; the defendant opened the car door himself and entered the vehicle without compulsion;[2] the officers yielded to his convenience by promising to drive him to his destination if he lost time. Allowing for any implications arising from the police uniform itself, we think the case for the judge's inference of nonarrest is quite as strong as it was in such instances as *Commonwealth* v. *Cruz*, 373 Mass. 676 (1977), and *Commonwealth* v. *Slaney*, 350 Mass. 400 (1966), where like conclusions were reached. The situation would have been clearer if the officers had told the defendant that he was free to go on his way if he chose; but this punctilio cannot be insisted on here. See *Commonwealth* v. *Cruz, supra* at 682 n.3.

The judge seemed to be appraising the defendant's own understanding of his situation (account being taken of the defendant's mental or psychological condition at the time),[3] but we need to add that, regardless of the defend-

---

[2] The defendant testified that Officer Russo "had his arm on my elbow, opened the door, put me in," but the judge accepted Officer Solari's testimony that the defendant opened the door and climbed into the car himself. Officer Solari also testified that there was no physical contact between the defendant and any of the officers.

[3] There is no inconsistency between the judge's finding of voluntari-

ant's inner reaction, there was no arrest for the present purpose if a reasonable person on the scene would not receive the impression that the defendant was being forcibly detained—unless, indeed, the officers had reason to understand that the defendant apprehended he was confronting force, and they then did nothing to disabuse his mind. See *United States* v. *Scheiblauer*, 472 F.2d 297, 301 (9th Cir. 1973); *Seals* v. *United States*, 325 F.2d 1006 (D.C. Cir. 1963). On this view, it also appears there was not an arrest. See *United States* v. *Chaffen*, 587 F.2d 920 (8th Cir. 1978); *United States* v. *Brunson*, 549 F.2d 348 (5th Cir.), cert. denied, 434 U.S. 842 (1977). We need not enter on a more refined subjective-objective analysis. See *State* v. *Kelly*, 376 A.2d 840 (Me. 1977); Model Code of Pre-Arraignment Procedure, Commentary to § 110.1 (1975); Cook, Subjective Attitudes of Arrestee and Arrestor as Affecting Occurrence of Arrest, 19 U. Kan. L. Rev. 173 (1971).

2. *The sneakers.* The judge ruled against suppression of the sneakers on the ground that the defendant surrendered them voluntarily to the officer. In a camera's eye, that is what happened. But the defense disputes a conclusion of consent. It presses a Fourth Amendment contention that, even if not in custody, the defendant was now in a coercive setting, with a tendentious question raised and unresolved—whether the stains were not in fact blood. See *Commonwealth* v. *Harmond*, 376 Mass. 557, 561-562 (1978). The defendant was not informed that he could withhold the sneakers. See *id.; Schneckloth* v. *Bustamonte*, 412 U.S. 218, 248-249 (1973). Again there is the element of the defendant's mental condition at the time.

The judge's finding of voluntariness is supported, and his ruling should not be disturbed. However, another basis for the ruling is at hand. On a conventional interpreta-

ness here and his finding, discussed below, that the defendant's condition of mind was one factor which, together with others arising later, rendered his confession involuntary.

tion, the articles were in "plain view," and so could have been taken in any event. For the officer, lawfully questioning the defendant, had a "legitimate reason for being present" (*Coolidge* v. *New Hampshire,* 403 U.S. 443, 466 (1971); the evidence, an article appearing to be bloodstained, was "come by 'inadvertently' " or "without particular design" (*Commonwealth* v. *Bond,* 375 Mass. 201, 206 [1978]); and the officer could recognize it, in combination with the statements received, "to be plausibly related as proof to criminal activity of which [he was] already aware." *Id.* See *Commonwealth* v. *Moynihan,* 376 Mass. 468 (1978); *Harris* v. *United States,* 390 U.S. 234 (1968). This interpretation is in accord with decisions applying the plain view rule to the seizure without warrant of clothing or other material believed to be bloodstained and thus connected with a crime under investigation. See, e.g., *Commonwealth* v. *Perez,* 357 Mass. 290 (1970); *Smith* v. *Slayton,* 484 F.2d 1188 (4th Cir. 1973), cert. denied, 415 U.S. 924 (1974); *United States* v. *Sheard,* 473 F.2d 139 (D.C. Cir. 1972), cert. denied, 412 U.S. 943 (1973); *State* v. *Hardin,* 90 Nev. 10 (1974); *State* v. *Rudd,* 49 N.J. 310 (1967). The case of *McCorquodale* v. *State,* 233 Ga. 369, 375 (1974), cert. denied, 428 U.S. 910 (1976), parallels our facts very closely. Professor LaFave might dispute whether, in strictness, the articles here, having not been come by in the course of a lawful search, were within the sense of the "plain view" doctrine (W.R. LaFave, Search and Seizure § 2.2, at 240-248 [1978]), but the whole going situation was one where a requirement of procuring a warrant for the sneakers would seem extravagant. Cf. *Cupp* v. *Murphy,* 412 U.S. 291 (1973).

3. *The confession.* (a) *Content.* Sergeant Kelley started his interrogation by stating that the victim was dead and the defendant was under arrest. The defendant: "I am under arrest?" (And later: "Under arrest for what?") Kelley recited the Miranda warnings, asking the defendant to acknowledge each sentence as it was recited, which the defendant did by saying "yes" or "right." Then followed

questions whether the defendant knew the victim. The
defendant went as far as to say that he had spoken with
her the previous Tuesday, but had not gone out with her.

Sergeant Kelley changed the subject to the sneakers
and said they had been tested positively for blood. When
the defendant tried again to account for this by referring
to a fight with Quish on Tuesday, Kelley said the blood
stains were fresh, made within hours, and scouted the
defendant's attempted (and weak) explanations of how
the stains could appear so although made on Tuesday.

Sergeant Kelley returned to the question of the defend-
ant's acquaintance with the victim, and now said that
they had been seen together on the church steps last
night by two witnesses (not named): both witnesses, he
said, were sure of the identification, reliable, and had
known the defendant for several years. Kelley said it was
not incumbent on him to show these witnesses to the
defendant, but the defendant could confirm with Feeney
and Madden that they had talked to the witnesses. (Kel-
ley referred to the two witnesses at least seven times and
later added, "we are not holding you here on a little
thread of evidence. We have a good case here.") The de-
fendant proceeded to admit he and the victim were
together on the church stairs about midnight, but he said
they had parted shortly afterwards. He added that he had
been "high" and "whacked out" on "downers"—fifteen
Valium pills (on top of a "few 6-packs"). At this point, the
interrogation seems to pause and take a turn with Mad-
den reporting a question supposed to have been raised by
the defendant: If he, the defendant, told them that he did
it, "what bearing would that have on the case and what
degree it would be?" Kelley went forward on two lines. On
the "bearing" of a confession, he spoke at some length. He
indicated a number of times that he could make no prom-
ises and would only be in a position to make it known to
the court and the attorneys that the defendant had coop-
erated and finally told the truth, and "the court looks
upon these cases, where a guy tells the truth, a lot better

than when we have to prove it the hard way." But he
went on to say: "if you wish to tell the truth of what
happened, then I can say in all fairness it would probably
help your defense; in fact, I am sure it would." "As I said
before, if there is anything more you want to add to it, and
my suggestion is the truth is going to be a good defense
in this particular case." The second line Kelley took was
to indicate there were extenuating factors: he laid stress
on the fact of the defendant's drunken condition and,
immediately after speaking of the "good defense," elicit-
ed from the defendant a "yes" answer to a leading ques-
tion about the victim's "provoking" the defendant. The
defendant first expressed doubt ("I don't know"), then
answered questions, many of them leading, to the effect
that he and the victim had gone to the Oak Street location
where the victim had refused to have intercourse with
him because (as she said) he was too young; that in his
drunken state he had lost control and kicked her and
found a stone nearby and threw it upon her; but he did
have intercourse with her, whether before or after the
beating, he could not remember. Finding her uncon-
scious, he fled. After most of the story had been elicited,
the defendant asked, "Does that mean I am railroaded in
now, then to be convicted and everything now?" Sergeant
Kelley: "No."

   (b) *Analysis.* The judge did not base himself on a single
factor, but rather on the cumulative effect of several,[4] in

---

   [4] Referring to the factors of defendant's youth, inexperience, and
psychological condition induced by his drug and alcohol intake, the
judge doubted seriously the effectiveness of the waiver of Miranda
rights, but in his apparent view (which we share) the decision is better
rested on those and other factors which in combination rendered the
confession involuntary. (As the judge noted, there is a place in the tape
of the interrogation which may be open to the interpretation that, at
a point before the most serious admissions, Sergeant Kelley went on
to question the defendant although the defendant had indicated that
that was all he wanted ["liked"] to say. See *Miranda* v. *Arizona,* 384
U.S. 436, 474 [1966]); *Commonwealth* v. *Mitchell,* 246 Pa. Super. Ct.

finding the confession "involuntary," or—to speak more accurately—in finding that the Commonwealth had not carried the heavy burden of establishing that it was voluntary, see *Commonwealth* v. *Murray*, 359 Mass. 541, 546 (1971); *Miranda* v. *Arizona*, 384 U.S. 436, 475 (1966). The factors were: communication of incorrect information about the strength of the Commonwealth's case; assurance that the defense would benefit from a confession; defendant's unstable condition combined with his youth and inexperience; failure to inform the defendant he could telephone his family or friends.

(i) It was true that one witness, John Carroll, gave a statement that he saw the defendant and the victim sitting on the church steps on the fatal night and that he had known and recognized them both. There was, however, no second witness who gave a like statement. Officer Kelley had in fact interviewed both Carroll and Joseph Ventola and had heard Ventola say that he did not recognize the male sitting on the steps. Ventola's description of the male actually contradicted Carroll's statement in the matter of whether the male was wearing a shirt. Officer Kelley's statements, repeatedly bracketing two witnesses as having known the defendant for years and as giving direct, mutually reinforcing identifications, were deceptive. The more general remarks about the strength of the Commonwealth's "case" served still further to give the impression that the case against the defendant was already proved. Taken alone, the misinformation would not, we think, suffice to show "involuntariness" (see *Frazier* v. *Cupp*, 394 U.S. 731 [1969]; *United States ex rel. Hall* v. *Director, Dep't of Corrections of Ill.*, 578 F.2d 194 [7th cir. 1978]), but the judge could view it as a relevant factor in considering whether the defendant's ability to make a free choice was undermined. See *Commonwealth* v. *Jackson, ante* 319, 328 & n.8 (1979); *United States ex rel. Everett* v. *Murphy*, 329 F.2d

132, 136 n.3 [1977]. The interpretation is dubious and again we pass to the better foundation of decision.)

68 (2d Cir.), cert. denied, 377 U.S. 967 (1964); *United States ex rel. Caminito* v. *Murphy,* 222 F.2d 698 (2d Cir. 1955); *Robinson* v. *Smith,* 451 F. Supp. 1278 (W.D.N.Y. 1978); Model Code of Pre-Arraignment Procedure, Commentary to § 140.4 (1975).

(ii) The judge could find that the police overstepped the permissible line in advising the defendant about the consequences a confession might have for the conduct of the defense.

. An officer may suggest broadly that it would be "better" for a suspect to tell the truth,[5] may indicate that the person's cooperation would be brought to the attention of the public officials or others involved,[6] or may state in general terms that cooperation has been considered favorably by the courts in the past.[7] What is prohibited, if a confession is to stand, is an assurance, express or implied, that it will aid the defense or result in a lesser sentence.[8]

Here the officer did emphasize that he could make no promises. But having said that, and uttered in addition the generalities about cooperation, he assured the defend-

---

[5] See *United States* v. *Barfield,* 507 F.2d 53 (5th Cir.), cert. denied, 421 U.S. 950 (1975); *State* v. *McLallen,* 522 S.W.2d 1 (Mo. App. 1975); *Bell* v. *State,* 258 Ark. 976 (1975); *Robinson* v. *State,* 229 Ga. 14 (1972); *Coursey* v. *State,* 457 S.W.2d 565 (Tex. Crim. App. 1970).

[6] See *United States* v. *Curtis,* 562 F.2d 1153, 1154 (9th Cir. 1977), cert. denied, 439 U.S. 910 (1978); *United States* v. *Frazier,* 434 F.2d 994 (5th Cir. 1970); *Fernandez-Delgado* v. *United States,* 368 F.2d 34 (9th Cir. 1966); *Burton* v. *Cox,* 312 F. Supp. 264 (W.D. Va. 1970); *People* v. *Hubbard,* 55 Ill. 2d 142 (1973).

[7] See *United States* v. *Reynolds,* 532 F.2d 1150 (7th Cir. 1976); *United States* v. *Glasgow,* 451 F.2d 557 (9th Cir. 1971); *Wallace* v. *State,* 290 Ala. 201 (1973).

[8] See *Bram* v. *United States,* 168 U.S. 532 (1897); *Grades* v. *Boles,* 398 F.2d 409 (4th Cir. 1968); *State* v. *Setzer,* 20 Wash. App. 46 (1978); *Bradley* v. *State,* 356 So.2d 849 (Fla. Dist. Ct. App. 1978); *State* v. *Williams,* 33 N.C. App. 624 (1977); *State* v. *Tardiff,* 374 A.2d 598 (Me. 1977); *Robinson* v. *State,* 229 Ga. 14 (1972); *Wallace* v. *State,* 290 Ala. 201 (1973); *State* v. *Castonguay,* 240 A.2d 747 (Me. 1968); *Lyter* v. *State,* 2 Md. App. 654 (1968); *State* v. *Fuqua,* 269 N.C. 223 (1967).

ant that a confession would "probably help your defense; in fact, I am sure it would." The further remark that "the truth is going to be a good defense in this particular case" goes further and carries an intimation that the defendant would be exonerated. Especially is this thought conveyed, when in the immediate background is the idea that a crime, if it was committed, would be palliated by the victim's "provocation" and by the defendant's inebriated condition at the time.

The law invoked here goes back many years. "No cases require more careful scrutiny," said this court in *Commonwealth* v. *Curtis*, 97 Mass. 574, 578 (1867), "than those of disclosures made by a party under arrest to the officer who has him in custody, and in none will slighter threats or promises of favor exclude the subsequent confessions." In that case the court excluded a confession given after an assurance by a police officer that "as a general thing it was better for a man who was guilty to plead guilty, for he got a lighter sentence." For other expressions of the policy, see *Commonwealth* v. *Smith*, 119 Mass. 305 (1876); *Commonwealth* v. *Taylor*, 5 Cush. 605 (1850); *Malloy* v. *Hogan*, 378 U.S. 1, 7 (1964); and for cases on either side of the line, compare *Bram* v. *United States*, 168 U.S. 532 (1897), and *State* v. *Pruitt*, 286 N.C. 442, 458 (1975), with *United States* v. *Williams*, 479 F.2d 1138 (4th Cir.), cert. denied, 414 U.S. 1025 (1973), and *United States* v. *Springer*, 460 F.2d 1344 (7th Cir.), cert. denied, 409 U.S. 873 (1972).

(iii) In the defendant's confession and affidavit on the motion to suppress, and his testimony and the testimony of others on voir dire, there was basis for questions to a medical expert called by the defense which led to the following opinion. If a person ingested ninety-five milligrams of Valium between 7:30 and 9 P.M. and between 7:30 and 11:30 P.M. drank twelve twelve-ounce bottles of beer,[9] there would be an impairment of memory, judg-

---

[9] In his affidavit the defendant stated that he took twenty five-

ment, and intellectual function for at least six hours. At 11:30 the next morning, a wearing-off of the effects of the drug might be expected, "how much can't be said with certainty." If, in addition, twenty-five milligrams were taken at 10:20 A.M. that morning,[10] there would be at 11:20 A.M. "some drowsiness, sedation, impairment of judgment and intellectual function." The same expert conceded that if a person took Valium once a week over a two-year period, some "tolerance would develop," but there was in fact no testimony that the defendant had been so regular a user. Expert testimony on the part of the Commonwealth was less suggestive of difficulties that the defendant might experience in the morning. The defendant testified that he was dazed and confused and unable to remember much of the questioning by the police. Reading and listening to the tape of the Kelley interrogation, one finds strings of questions answered with monosyllables ("not reassuring explanations of his asserted comprehension," *Commonwealth* v. *Daniels*, 366 Mass. 601, 608 [1975]); confusion, too, in the defendant's questions about whether he was under arrest and whether he was to be "railroaded." Other answers were more forthcoming and involved some reasoning. The judge concluded that the defendant's judgment at that time was "dim" and "impaired." If it should be assumed that this condition would not alone justify suppression of the admissions (compare *Commonwealth* v. *White*, 374 Mass. 132 [1977], aff'd by an equally divided court, 439 U.S. 280

---

milligram tablets of Valium at about 9 P.M. on June 10, drank about twelve containers of beer between 6 and 11 P.M. that evening, and about 8:30 A.M. on the following morning ingested an additional three or four Valium tablets. During the voir dire he added that he had smoked an unspecified quantity of marihuana on the evening of June 10.

[10] In fact the defendant said that he ingested Valium at about 8:30 A.M.; but the testimony as to the duration of the effects of the drug indicated that the one hour and fifty-minute disparity would not make a material difference.

[1978], with *Commonwealth* v. *Doyle, ante* 132 [1979]), it would still be entitled to count in the judge's total assessment. See *Commonwealth* v. *Johnston,* 373 Mass. 21 (1977); *United States* v. *Grant,* 427 F. Supp. 45, 50 (S.D.N.Y. 1976).[11] So also the judge could give weight to the defendant's youth, inexperience, and limited schooling. See *Commonwealth* v. *Cain,* 361 Mass. 224, 228-229 (1972).

(iv) Especially in light of the defendant's youth, inexperience, and condition, a violation of G. L. c. 276, § 33A, as amended through St. 1963, c. 212, assumes importance. A person under arrest at a station with a telephone is entitled to be informed "forthwith upon his arrival . . . of his right to so use the telephone [i.e., to communicate with his family or friends], and such use shall be permitted within one hour thereafter." It has been held that unfavorable evidence, obtained as the result of an intentional deprival of the statutory right, should be considered inadmissible and subject to suppression. *Commonwealth* v. *Jones,* 362 Mass. 497 (1972). We have not yet ordered suppression in a case where, although deprivation has occurred, it was not through proved intention; but we have lately again given warning of the importance of the statutory duty. See *Commonwealth* v. *Alicea,* 376 Mass. 506, 511 n.11 (1978). We agree with the judge that the failure affirmatively to comply with the statute is a factor in deciding whether a confession, vulnerable on other grounds, should be suppressed. Incidentally, it is clear, as will be seen below, that had the defendant called his mother or brother, they would have advised him not to speak to the police.

To conclude: The defendant, eighteen years of age, with a poor educational background, uninformed of his right to reach his family or friends, his judgment impaired through intoxication, confessed after being told that the case against him was established and after receiving as-

---

[11] See note 4, *supra.*

surance that the confession would assist his defense. We should not interfere with the judge's conclusion that the confession was involuntary and inadmissible.

4. *The dungarees.* When Officer Solari presented his application for the search warrant, the police were in possession of evidence probably sufficient, apart from the confession, to justify the issuance. The application, however, omitted mention of the crucial parts of this evidence, and the Commonwealth proceeds here on the assumption that the warrant rests on the confession. So the question is raised whether the warrant can legalize the seizure of the dungarees, when it is held that the confession must be suppressed. We agree that the answer is no, and this is explained simply on the ground that the confession was involuntary and thus directly offensive to the Fifth Amendment. See *United States ex rel. Hudson* v. *Cannon,* 529 F.2d 890, 892-893 (7th Cir. 1976); *United States* v. *Massey,* 437 F. Supp. 843, 861-862 (M.D. Fla. 1977). Cf. *United States* v. *Castellana,* 488 F.2d 65 (5th Cir. 1974); *United States* v. *Cassell,* 452 F.2d 533, 541 (7th Cir. 1971). The conclusion follows from our recent decision of *Commonwealth* v. *White, supra* at 138-139, where we suggested that the reasons for excluding the product of a warrant based on an inadmissible confession are surely no less persuasive than those for excluding material seized in pursuance of a warrant supported by an affidavit infected by evidence that has been unlawfully seized. See Model Code of Pre-Arraignment Procedure, Commentary to § 150.4 (1975).

There are cases in the Supreme Court suggesting that in certain circumstances evidence, secured as a result of a confession elicited by a violation of the prophylactic Miranda rule, need not be excluded on any constitutional ground. See *Michigan* v. *Tucker,* 417 U.S. 433 (1974). Cf. *Oregon* v. *Hass,* 420 U.S. 714 (1975); *Harris* v. *New York,* 401 U.S. 222 (1971) (the latter case was followed in *Commonwealth* v. *Harris,* 364 Mass. 236 [1973]). Those cases do not, however, reach the present, where the confession

was involuntary. This distinction has been noted by the court.[12] We add that our position here is consistent with both the majority and minority views expressed in *Commonwealth* v. *Mahnke*, 368 Mass. 662 (1975), cert. denied, 425 U.S. 959 (1976).

5. *The afternoon statement.* News of the defendant's trouble did not reach his mother or brother until midafternoon. About 3:45 P.M. they arrived at the police station and were informed that the defendant had already confessed the crime. Sergeant Feeney and at least one other officer escorted the pair to the defendant's cell. Feeney testified that, as his visitors appeared, the defendant blurted out, "Ma, I didn't mean to hit her so hard." According to the defendant and his mother, he said only, "I'm sorry, ma." The mother and brother said loudly the defendant should say nothing to the police. The encounter was extremely emotional; the three were shouting at different points in the conversation.

In contending that any incriminating statement was consequent upon the involuntary confession and therefore similarly inadmissible, the defendant relies on the "cat out of the bag" analysis, which requires "the exclusion of a statement if, in giving the statement, the defend-

---

[12] In *Michigan* v. *Tucker*, 417 U.S. 433 (1974), where the Court held that testimonial evidence need not be excluded because it was obtained as a result of a confession elicited in violation of Miranda, the confession "could hardly be termed involuntary." Thus "the police conduct . . . did not deprive respondent of his privilege against compulsory self-incrimination as such, but rather failed to make available to him the full measure of procedural safeguards associated with that right since *Miranda*." *Id.* at 444-445. See also *Oregon* v. *Hass*, 420 U.S. 714, 722 (1975); *Harris* v. *New York*, 401 U.S. 222, 224 (1971). After *Michigan* v. *Tucker*, some courts have expressed doubt as to whether physical evidence gathered as a result of a confession which is voluntary but obtained in violation of Miranda requirements must always be excluded as its "fruits." See *United States ex rel. Hudson* v. *Cannon*, 529 F.2d 890, 894 n.3 (7th Cir. 1976); *Rhodes* v. *State*, 91 Nev. 17, 23 (1975). But see *Commonwealth* v. *Caso, ante* 236 (1979); *United States* v. *Ceccolini*, 435 U.S. 268 (1978) (suggesting that derivative physical evidence will less readily be admitted than derivative testimonial evidence).

ant was motivated by a belief that, after a prior coerced statement, his effort to withhold further information would be futile and he had nothing to lose by repetition or amplification of the earlier statements." *Commonwealth* v. *Mahnke, supra* at 686. See *Commonwealth* v. *Watkins,* 375 Mass. 472, 480-483 (1978); *United States* v. *Bayer,* 331 U.S. 532, 540 (1947). The judge below pointed to the following circumstances to show that the conditions of the statement were different from those of the confession and the two were thus independent: the statement was not prompted by police interrogation or made to the police (although police officers were within hearing), but was rather made to the family, and it appeared spontaneous.

Here we are obliged to hold that the judge committed error. His conclusion is not supported, and a contrary conclusion plainly is. The error actually derives from a misperception of the law.

It has been suggested that "there is a strong basis both in logic and in policy for drawing the inference that the second confession was the product of the first, and for permitting that inference to be overcome only by such insulation as the advice of counsel or the lapse of a long period of time." *United States* v. *Gorman,* 355 F.2d 151, 157 (2d Cir. 1965), cert. denied, 384 U.S. 1024 (1966) (Friendly, J.). See *Brown* v. *Illinois,* 422 U.S. 590, 605 & n.12 (1975); *Darwin* v. *Connecticut,* 391 U.S. 346, 350-351 (1968) (Harlan, J., concurring in part and dissenting in part). The factors relied on by the judge were not themselves strong enough to provide "insulation," and in all events they were quite overcome by other circumstances. The statement was made a relatively short time after the confession, and at the same place; it was corroborative of the confession; there was no opportunity for consultation with family; although, as we have noted, there had been a statement that the confession would help the defendant or even free him in the end, we cannot say he had such confidence as would mark a "break in time or the stream

of events" (see *Commonwealth* v. *Haas,* 373 Mass. 545, 554 [1977]) sufficient to dissociate the statement from the confession. Cf. *Commonwealth* v. *Mahnke,* 368 Mass. at 667. Nor do we think it may be assumed that remorse was so far at work as to provide the "break." See *id.* at 688 & n.31; *Copeland* v. *United States,* 343 F.2d 287, 291 & n.3 (D.C. Cir. 1964). Finally, the confession was rendered involuntary by police misconduct which cannot be termed inadvertent. Cf. *Knott* v. *Howard,* 378 F. Supp. 1325 (D.R.I. 1974), aff'd, 511 F.2d 1060 (1st Cir. 1975). The burden was on the Commonwealth to show circumstances insulating the statement from the confession, see *Brown* v. *Illinois, supra* at 604, and in this we think it must fail.

Our conclusion is in accord with other decisions requiring the suppression of an inculpatory statement which followed an inadmissible confession and which was not made in the course of police interrogation. See *Ricks* v. *United States,* 334 F.2d 964 (D.C. Cir. 1964); *State* v. *Paz,* 31 Or. App. 851 (1977). Cf. *Copeland* v. *United States, supra* at 292 (Bazelon, C.J., concurring in part and dissenting in part); *Commonwealth* v. *Bordner,* 432 Pa. 405 (1968); *Soolook* v. *State,* 447 P.2d 55 (Alas. 1968), cert. denied, 396 U.S. 850 (1969).

6. *Conclusion.* The order of the Superior Court is reversed in so far as it denied the defendant's motion to suppress the alleged mid-afternoon inculpatory statement; in all other respects it is affirmed. The case is remanded to the Superior Court for further proceedings consistent with this opinion.

*So ordered.*