COMMONWEALTH *vs.* MARTIN McCAULEY.

Suffolk.  January 10, 1984. — April 19, 1984.

Present: HENNESSEY, C.J., LIACOS, ABRAMS, NOLAN, & O'CONNOR, JJ.

*Homicide.  Felony-Murder Rule.  Evidence,* Admissions and confessions.
   *Practice, Criminal,* Admissions and confessions, Instructions to jury.

The judge in a murder case did not err in concluding that a statement by the
   defendant to a police officer was voluntarily made, where evidence at
   the hearing on the motion to suppress the statement warranted the judge's
   findings that, despite the defendant's alleged sleeplessness and use of
   alcohol and drugs, the defendant appeared normal and had little difficulty
   recalling in detail the events of the incident in question, and that the
   police officer made no promise of leniency as claimed by the defendant.
   [700-702]
In the circumstances, a conflict in the testimony of two police officers at the
   trial of a murder case as to whether one of the officers had made a
   promise of leniency to the defendant before the defendant gave a state-
   ment to the police officer did not require the judge to suppress the
   defendant's statement or to conduct, on his own initiative, a voir dire
   hearing on the issue of voluntariness. [702-704]
At the trial of a murder case arising from a shooting during an armed robbery,
   the judge did not err in instructing the jury that an accidental killing
   would not alter in any way the first degree felony-murder rule. [704]

INDICTMENTS found and returned in the Superior Court De-
partment on July 7, 1981.

Motions to suppress evidence were heard by *McGuire,* J.,
and the cases were tried before *Alberti,* J.

*Thomas J. Ford* for the defendant.

*David B. Mark,* Assistant District Attorney, for the Com-
monwealth.

NOLAN, J.  A jury convicted the defendant, Martin
McCauley, of murder in the first degree, armed robbery of
Carlos Madariaga, the murder victim, armed robbery of An-
tonio Datri, and unlawfully carrying a firearm. The trial judge

sentenced the defendant to mandatory life imprisonment on the murder conviction, a concurrent life term on the two armed robbery convictions, and a concurrent term of from three to five years on the firearm conviction.

On appeal the defendant asserts error in (1) the denial of his motion to suppress incriminating statements made to the police, (2) the failure of the judge to conduct sua sponte a voir dire hearing on the issue of voluntariness, and (3) the judge's instructions on first degree felony-murder. In addition, the defendant requests that this court order a new trial pursuant to G. L. c. 278, § 33E. We conclude that the defendant's statements were properly admitted, that the judge had no obligation to conduct sua sponte a voir dire, and that the jury instructions on first degree felony-murder were correct. Moreover, this case does not present an appropriate occasion for the exercise of our powers under G. L. c. 278, § 33E.

On June 27, 1981, at approximately 1:30 A.M., two masked men entered the Casa Romero Restaurant in the Back Bay section of Boston from the Gloucester Street entrance. The restaurant was closed. Upon entering the first dining room, the masked men, brandishing guns, ordered a cook, Antonio Datri, and a dishwasher, Jose "Freddy" Perez, to lie face down on the floor.

As one of the gunmen proceeded into the second dining room, he encountered the victim, a comanager of the restaurant. The victim had entered the second dining room from the office after he and his wife, Laura Madariaga, heard a scream. Laura Madariaga remained hidden behind the office door. The gunman asked the victim where the woman was. The victim stated that the woman had left for the evening. On the gunman's third command, the victim lay on the floor face down. As the victim did so, he yelled "Laura, run," in Spanish and then in English. Laura locked the office door, escaped through an office window, and started ringing doorbells and screaming for help. One gunman then directed the three restaurant employees to move together on the floor. At that time, he seized their wallets and the cash receipts.

The three employees were then directed out a side door leading to an alley. Datri testified that, in the alley, one gunman[1] said to the victim, "I like you. You think you're smart." As he said this, he raised the revolver in his right hand and shot the victim between the eyes from a distance of less than one inch. Perez's testimony partially corroborated Datri's testimony. He stated that the gunman said something to the victim in English,[2] raised his revolver with his right hand, and shot the victim between the eyes from a distance of approximately two inches. Dr. Leonard Atkins, associate medical examiner for Suffolk County, testified that the discharge pattern around the victim's wound indicated that the gun had been fired from within six inches of the victim's forehead.

The defendant, in his statement to the police, stated that the shooting was an accident. As he came out the door into the alley, he transferred the gun from his right to his left hand because he "was going to hold the door and have them go back inside." As he turned to grab the door, the gun went off accidentally because his left hand is "paralyzed." Dr. Barry Simmons testified that he had performed surgery on the defendant's left wrist five or six years before the trial. This surgery left the defendant with some numbness in the left hand, but the defendant's hand was not technically paralyzed.

At approximately 1:45 A.M., after the shooting, the two gunmen were seen fleeing the alley. As the defendant ran, he threw away his mask, his gun, his jacket, and his gloves. The two men got into a van parked on Hereford Street. The van was driven by one Joseph Barry. The van almost immediately after starting smashed into a parked car. The two gunmen were seen fleeing from the vehicle, while the driver remained with the vehicle until the police arrived.

A Boston police officer, Carl Nemes, at approximately 1:55 A.M., espied the defendant trying to hail a taxi on Commonwealth Avenue, not far from the Casa Romero Restaurant. Upon noticing the police cruiser, the defendant immediately

---

[1] This gunman was later shown to be the defendant.

[2] Perez did not understand English.

brought his arms down and started walking in the opposite direction. Nemes, aware of the incident at the restaurant, decided to stop the defendant. As the police pulled up, the defendant asked, "What's wrong? Did something happen around here?" The defendant told Nemes that he was coming from a party and identified himself with a California driver's license. Nemes noticed that the defendant's hair was "all messed up and stringy."

After investigating the scene the police discovered nearby Perez's wallet, the envelope with the cash receipts in it, an automatic pistol, some white work gloves, and a .22 caliber revolver. The Commonwealth's ballistics expert, Officer William Murphy, compared the bullet retrieved from the victim's skull with a bullet test fired from the revolver. After microscopic testing, he determined that the revolver found on Hereford Street had fired the fatal bullet.

Detective Paul J. Murphy and his partner Sergeant Stephen Murphy arrested the defendant in the Mission Hill area of Boston on June 30, 1981, at approximately 1 A.M. The defendant was given his Miranda warnings at the police station. Detective Peter O'Malley, chief investigating officer, arrived at the police station between 3 A.M. and 3:30 A.M. and took the defendant's statement at 4:40 A.M. after again advising him of his Miranda rights.

1. *Pretrial motion to suppress.* The defendant asserts that the motion judge erred in denying his pretrial motion to suppress his statement to the police. Specifically, the defendant contests the judge's determination that the statements were not the product of a "deal" or a promise of leniency by the police.[3]

In reviewing a judge's determination that a defendant voluntarily made statements to the police, we will afford substantial deference to a judge's ultimate findings and uphold a judge's subsidiary findings if warranted by the evidence. *Commonwealth* v. *Williams,* 388 Mass. 846, 851 (1983). When determining voluntariness, "the court must assess the totality of rele-

---

[3] The defendant has not argued that the Miranda requirements were not scrupulously met.

vant circumstances to ensure that the defendant's confession was a free and voluntary act and was not the product of inquisitorial activity which had overborne his will." *Commonwealth* v. *Mahnke,* 368 Mass. 662, 680 (1975), cert. denied, 425 U.S. 459 (1976).

At the hearing the defendant testified that, from the time the crime was committed to the time of his arrest, he had not slept and had ingested at various times amounts of alcohol, heroin, Valium, cocaine, and methadone.[4] He stated that he was tired and confused during the whole interrogation, but he admitted that he had no trouble staying awake.

The defendant also testified that he made a statement to Detective O'Malley only after O'Malley offered him a "deal." The defendant stated that he spoke with O'Malley for over one hour before the tape recorded statement was taken. During that time, O'Malley allegedly explained to him about the different penalties imposed for murder in the first degree and second degree and that in fifteen years the defendant would only be thirty-nine years old. The defendant said that O'Malley asked him if he had ever been in the "big house." Then O'Malley allegedly stated, "[I]f you help us, we can help you." The defendant took this to mean that, if he aided the police, he could avoid spending the rest of his life in prison.

Detective O'Malley denied making the statement, "[I]f you help us, we can help you," asking the defendant about the "big house," and saying the defendant would be eligible for parole at thirty-nine years of age. He also had no memory of discussing the difference between murder in the first degree and murder in the second degree. In addition, he unequivocally stated, "[H]e was the shooter. I was not in any way going to offer him any assistance in any which way." Sergeant Stephen Murphy, who was present during parts of the interrogation, testified that he did not hear O'Malley offer any deals to the defendant. He also stated the defendant had no trouble communicating.

---

[4] These assertions were corroborated by his girl friend's testimony.

The motion judge (he was not the trial judge) found that, despite his alleged sleeplessness and use of alcohol and drugs, the defendant appeared normal and had little difficulty recalling in detail the events of the incident. He further found that Detective O'Malley held out no promise of leniency to the defendant. On these findings he concluded that the defendant's statements were made voluntarily. We uphold the judge's ultimate rulings and conclude that the subsidiary findings were warranted by the evidence.

We agree with the defendant's claim that a confession of guilt drawn from a defendant by promise of favor or induced by promise of benefit is not admissible because it is not voluntarily made. *Commonwealth* v. *Fournier,* 372 Mass. 346, 348 (1977). However, the question before us is not whether the alleged promise was prohibited in that it promised that the confession would aid in the defense or result in a lesser sentence, see *Commonwealth* v. *Meehan,* 377 Mass. 552, 564 (1979), cert. dismissed, 445 U.S. 39 (1980), but rather whether the motion judge correctly determined that, in fact, no promise or inducement was ever made.

In this situation, it is clear that the motion judge's subsidiary findings are based primarily on his assessment of the witnesses' credibility. This is a resolution within the province of the motion judge. *Commonwealth* v. *Meehan, supra* at 557. Clearly, the judge chose to believe Detective O'Malley. The judge is not required to believe the defendant. See *Commonwealth* v. *Perry,* 389 Mass. 464, 466 (1983). For this reason, we find that the motion judge did not err in denying the defendant's motion to suppress.

2. *Motion to suppress as matter of law made at trial.* Detective Paul Murphy, one of the arresting officers, testified at trial. Murphy had not been called to testify by the defendant at the hearing on the motion to suppress. During the course of cross-examination, Murphy stated that he believed that O'Malley had said to the defendant before taking the defendant's statement, "[I]f you help us, we'll help you." He also vaguely remembered that O'Malley explained to the defendant the difference between murder in the first degree and murder in

the second degree. However he also admitted that he was in and out of the room and was not present throughout the whole interrogation. O'Malley took the stand next and again denied making any promises of leniency.

Just before the Commonwealth played the defendant's recorded statement at trial, defense counsel asked the judge to suppress the statement claiming suppression was required as a matter of law. He based his request on the conflict in the police officers' testimony. The trial judge correctly denied this motion.[5] On appeal the defendant contends that the judge erred in his denial and in his failure to conduct sua sponte a voir dire hearing on the issue of voluntariness. We do not agree.

Relying on *Commonwealth* v. *Harris,* 371 Mass. 462, 471-472 (1976), the defendant claims that the judge was required to conduct sua sponte a voir dire on the issue of voluntariness and then suppress the statements. In *Harris,* the issue of voluntariness had not been raised by defense counsel at any time prior to this testimony. "The egregious nature of those allegations . . . and the fact that Harris's testimony was not rebutted by the police justified our conclusion that the judge should have acted sua sponte." *Commonwealth* v. *Brady,* 380 Mass. 44, 51 (1980). See *Commonwealth* v. *Harris, supra.* By contrast in this case the defendant had an opportunity to raise this issue earlier. Defense counsel admitted in oral argument that Murphy was available to testify at the suppression hearing. There is no indication on the record, and the defendant fails to allege, that the Commonwealth concealed this evidence.[6]

Since the defendant did not seek a second voir dire at trial we review his claim to determine whether there is a substantial likelihood of a miscarriage of justice. See G. L. c. 278, § 33E. Murphy's assertions were thoroughly rebutted by O'Malley's testimony (a factor making this case significantly different from *Harris, supra*). Defense counsel had every opportunity to

---

[5] Of course, the credibility of witnesses is not determined by the number of witnesses appearing for one side or the other.

[6] Because the defendant did not request a second voir dire we leave open the question whether it would have been error to deny a request for a second voir dire. See *Commonwealth* v. *Bryant,* 390 Mass. 729, 745 n.21 (1984).

raise this issue earlier and to explore these inconsistencies on cross-examination. See *Commonwealth* v. *Therrien,* 359 Mass. 500, 507 (1971).

Furthermore, the judge observed that the conflicting testimony created a live issue of voluntariness at trial which required an instruction to the jury. *Commonwealth* v. *Alicea,* 376 Mass. 506, 523 (1978). His charge on this matter was complete and correct. He specifically stated to the jury, "If you find that there were improper promises, you may use that conclusion and weigh it in and factor it in your determination of whether or not the statement was voluntarily made." In these circumstances, we conclude that there was no substantial risk of a miscarriage of justice.

3. *Instructions on felony-murder.* The defendant contends that the judge erred as a matter of law when he instructed the jury that an accidental killing would not alter in any way the first degree felony-murder rule. The judge said, "[E]ven though the gun may have gone off by accident, you are still warranted in finding the defendant guilty of murder in the first degree." We find no error in this instruction. We have recently determined that an assertion of accidental shooting in an armed robbery does not require an instruction on involuntary manslaughter. *Commonwealth* v. *Evans,* 390 Mass. 144, 150-151 (1983). We adhere to this rule and find that a defendant's allegation that the gun discharged accidentally during an armed robbery is of no consequence. *Id.* at 152.

4. *Review under G. L. c. 278, § 33E.* In accordance with the defendant's request we have carefully reviewed the record and we find that the result reached was consonant with justice, and, consequently, we leave the murder verdict undisturbed.

*Judgments affirmed.*