NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-13296

MARTIN McCAULEY vs. SUPERINTENDENT, MASSACHUSETTS CORRECTIONAL
INSTITUTION, NORFOLK, & another.[1]


Suffolk.     September 9, 2022. - April 3, 2023.

Present:  Budd, C.J., Gaziano, Lowy, Cypher, Kafker, Wendlandt,
& Georges, JJ.


Parole.  Imprisonment, Parole.  Commissioner of Correction.
    Statute, Construction.  Regulation.  Administrative Law,
    Regulations.  Practice, Civil, Relief in the nature of
    certiorari.  Constitutional Law, Separation of powers.
    Words, "Debilitating."



    Civil action commenced in the Supreme Judicial Court for
the county of Suffolk on March 1, 2021.

    Following transfer to the Superior Court Department, the
case was heard by Maureen Mulligan, J., on motions for judgment
on the pleadings.

    The Supreme Judicial Court on its own initiative
transferred the case from the Appeals Court.


    Jeffrey G. Harris for the plaintiff.
    Stephanie M. Caffrey for the defendants.
    Mara Voukydis, Committee for Public Counsel Services, Tatum
A. Pritchard, Jacob Addelson, David Milton, Lauren Petit, & Ada

---

[1] Commissioner of Correction.

Lin, for Prisoners' Legal Services of Massachusetts & others, amici curiae, submitted a brief.

CYPHER, J. Martin McCauley, the plaintiff, is a sixty-six year old man serving a life sentence without the possibility of parole for his conviction of murder in the first degree. He petitioned for medical parole under G. L. c. 127, § 119A (§ 119A or statute), and the Commissioner of Correction (commissioner) denied his petition. After two requests for reconsideration, which also were denied, he brought this action in the nature of certiorari in the Superior Court against the commissioner and the superintendent of the Massachusetts Correctional Institution at Norfolk (collectively, defendants). In this opinion, we consider whether 501 Code Mass. Regs. § 17.02 (2019), which, in relevant part, defines "debilitating condition" for purposes of applying the statute, impermissibly narrows the group of prisoners who qualify for medical parole, and whether the commissioner abused her discretion in denying the plaintiff's request for medical parole. We conclude that the regulation does not impermissibly narrow the scope of the statute, but that in spite of the commissioner's proper consideration of numerous relevant factors in making her decision, she abused her discretion in denying the plaintiff's petition where she did not

have the benefit of the standardized risk for violence assessment required by the regulations.[2]

Background.  1.  Petition for medical parole and proceedings below.  On April 2, 2020, the plaintiff filed his initial pro se petition for medical parole pursuant to § 119A with the deputy superintendent of the Massachusetts Correctional Institution at Norfolk (MCI-Norfolk).  On April 17, 2020, his attorney filed a new petition on the plaintiff's behalf.  The plaintiff argued that he was permanently incapacitated, citing the opinions of Dr. Steven Descoteaux, the Wellpath[3] medical director for the Department of Correction (department), and Dr. Michael Moore, medical director of MCI-Norfolk, and adding additional ailments from which the plaintiff reported he was suffering.  He urged that he is unlikely to return to violating the law if released because he is no longer "hooked on illegal drugs," he is older and wiser, and he has strong family support.[4]

---

[2] We acknowledge the amicus brief submitted by Prisoners' Legal Services of Massachusetts, the Disability Law Center, and the Committee for Public Counsel Services.

[3] The Department of Correction's (department's) medical provider.

[4] In the memorandum drafted in support of the plaintiff's petition, his attorney mentioned a 2015 disciplinary report related to the plaintiff's attempt to take pills from the hand of an officer, which resulted in his being "brought to the floor."  This report did not appear in the administrative record.

The plaintiff asserted that because of his "crippling challenges," his release was not incompatible with the welfare of society.  The plaintiff included a release plan recommending release to a family member.

On April 28, 2020, the former superintendent of MCI-Norfolk, Steven Silva, recommended against releasing the plaintiff on medical parole.[5]  In making his recommendation, Silva noted observations of a correction officer working on the unit where the plaintiff resides, who stated that the plaintiff does not need any assistance dressing, showering, or toileting, and that he walks outside frequently with his "rollator" walker, "at times quickly."  "Regarding the required assessment of the risk for violence that the inmate poses to society pursuant to G. L. c. 127, [§ 119A (c)]," Silva enclosed a copy of the plaintiff's most recent classification report and personalized program plan.  He noted that the plaintiff "does not receive a Risk or Needs Assessment" due to his sentence of life without parole.[6]  Because the plaintiff refused to participate in the

---

[5] Nelson Alves, the current superintendent of MCI-Norfolk, is the superintendent named in the commissioner's letters denying medical parole in August 2020 and February 2021.

[6] In the administrative record, there is a placeholder page that states, in large font, "Due to Inmate [McCauley] current sentence of First Degree Life A Risk Assessment was not completed."

Texas Christian University Drug Screen evaluation (TCUD),[7] recommended to address the plaintiff's substance use concerns, Silva could not provide information about the plaintiff's risk for improper substance use.  The plaintiff's 2020 classification report, discussed infra, indicated that the TCUD assessment would help to address concerns over his substance use, but that he declined to participate in 2017.

The plaintiff's 2020 classification report resulted in a score of one, which suggested that he be placed in minimum custody.[8]  The classification report stated that he received a six for his current offense (murder in the first degree, armed robbery, and unlawfully carrying a firearm); a zero for severity of convictions within the last four years, history of escape attempts, history of prior institutional violence within the last three years, number of disciplinary reports within the last

---

[7] The evaluation consists of a form in which participants answer a series of substance use-related questions.  TCU Institute of Behavioral Research, TCU Drug Screen 5 (Sept. 2020), https://ibr.tcu.edu/wp-content/uploads/2020/09/TCU-Drug-Screen-5-Sept20.pdf [https://perma.cc/BC33-N8VL].

[8] A prisoner can get a score of up to twenty-nine points on an initial classification and thirty-six points on reclassification.  A score of twelve or higher indicates that maximum custody is recommended; seven to eleven recommends medium custody; six or fewer recommends minimum custody.  Department of Correction, Male Objective Point Base Classification Manual 8-17 (Nov. 18, 2019), https://www.mass.gov/doc/male-objective-point-base-classification-manual/download [https://perma.cc/DD5J-RQRM].

twelve months, and most severe disciplinary report within the last twelve months; a minus three for his age; and a minus two for program participation and work assignment.  Because the plaintiff received a sentence of life without parole, a department restriction prevents him from being placed in minimum custody.  Therefore, it was recommended that he remain where he was and "[c]ontinue positive behavior and pursue the recommended programming."  The plaintiff's personalized program plan indicated that, among other things, anger and criminal thinking were not considered a "need area" for programming for the plaintiff.

A department staff member spoke with the family member with whom the plaintiff planned to live, who stated that she lived on the second floor of a building with seventeen steps leading to the condominium.  The condominium itself easily is accessible with a rollator walker.  The plaintiff told his family member "that he has no issues using the stairs and that being on the second floor [would] not be a problem."

Silva recommended that the plaintiff's petition for medical parole be denied, pointing to "his criminal history, the disturbing facts underlying [his] conviction, . . . institutional violence and extensive disciplinary issues, especially those involving drug transactions and the attempted introduction of heroin into the" facility.  Despite his medical

condition, the superintendent opined that the plaintiff presented a significant risk to public safety.[9]

On June 5, 2020, the commissioner denied the petition. She found that the plaintiff's medical conditions were not so debilitating that he did not pose a public safety risk. As reasons therefore, she referenced the facts of the plaintiff's conviction, considering that he "has never agreed with the facts of his conviction"; his disciplinary history while incarcerated; the medical assessment conducted by Descoteaux and Moore; the accommodations that have been put in place to mitigate the effects of the plaintiff's medical condition; the plaintiff's various suggestions for home placement; Silva's submissions and recommendation; letters in support of the plaintiff's release; and the opinions of the district attorney's office as well as those of a relative of the victim. Although the commissioner recognized both doctors' opinions that the plaintiff is permanently incapacitated, she stated that, given his accommodations including a leg brace, walker, and lower bunk assignment, "his permanent incapacitation is not so debilitating that he does not pose a public safety risk." She also noted

---

[9] The office of the district attorney for the Suffolk district sent an e-mail message to the department regarding the plaintiff's application, stating that the office was unable to conclude, at that time, that the plaintiff satisfied the statutory criteria of § 119A.

that the plaintiff, allegedly, was suffering from his "left hand paralysis" when he killed the victim.

On June 10, 2020, five days after the initial denial, the plaintiff requested reconsideration of the petition. On August 17, 2020, the commissioner denied the petition again, considering additional medical records submitted by the plaintiff and the unchanged positions of the district attorney's office and the victim's wife. The commissioner incorporated by reference all her reasons for denial in her June 2020 decision, and she noted that she did not find a material change in circumstances warranting reconsideration of her decision.[10] On December 18, 2020, the plaintiff filed a second request for reconsideration of his petition, which the commissioner denied on February 2, 2021. She considered the updated medical assessment conducted by Moore and Descoteaux. She also considered the statement from the district attorney's office, which no longer opposed the plaintiff's request for medical parole, and which referenced the medical assessment indicating that he is permanently incapacitated and "the existence of a

---

[10] In Harmon v. Commissioner of Correction, 487 Mass. 470, 477 (2021), we held that the mandatory language of G. L. c. 127, § 119A (c) (1), does not permit the department to require "a significant and material decline in medical condition" to submit a new petition. Consequently, we do not consider this reason in determining whether the commissioner's decision was an abuse of discretion.

sufficiently detailed release plan that provides for the reintegration of the defendant and, most importantly, the safety of the public."[11]  Despite these additional considerations, the commissioner determined that there was not "a significant and material" change in the plaintiff's circumstances, and denied the request for the reasons articulated in her previous decisions.  Because the plaintiff was able to care for himself with the accommodations provided to him, and referencing the reasons set forth in her prior decisions, she found that he would be unlikely to "live and remain at liberty without violating the law" and that his release would be "incompatible with the welfare of society."

On March 1, 2021, the plaintiff commenced an action in the nature of certiorari in the county court pursuant to G. L. c. 249, § 4.  A single justice transferred the case to the Superior Court.  In May 2021, the plaintiff filed a motion for judgment on the pleadings; the defendants filed an opposition to the motion and a cross motion for judgment on the pleadings.  After a hearing, a Superior Court judge denied the plaintiff's motion and granted the defendants' cross motion.  The judge found that the commissioner's decision was reasonable in the circumstances, in light of the plaintiff's prison disciplinary

---

[11] The commissioner again incorporated by reference her June and August 2020 decisions.

history, his ability to care for himself on a daily basis in the general prison population, and his ability to ambulate with the accommodation of a rollator walker.  The plaintiff appealed from the judge's decision to the Appeals Court, and we transferred the case to this court on our own motion.

2.  Criminal case.  Following a jury trial, the plaintiff was convicted of murder in the first degree, two counts of armed robbery, and unlawfully carrying a firearm, and was sentenced to life in prison in March 1982.[12]  We affirmed his convictions. Commonwealth v. McCauley, 391 Mass. 697, 697-698 (1984), cert. denied, 534 U.S. 1132 (2002).  Those convictions stemmed from an incident in June 1981, in which two masked men entered a closed restaurant, brandished guns, and ordered employees to lie face down on the floor.  Id. at 698.  One of the gunmen encountered the victim, a comanager of the restaurant, who walked from the office to the dining room as his wife was hiding behind the office door.  Id.  The victim told the gunman, after being questioned, that the woman had left for the evening.  Id.  As the victim was directed to lie on the floor, he yelled for his wife to run.  Id.

---

[12] Including the murder charge, the plaintiff has had twenty-two adult arraignments and three juvenile arraignments. These resulted in six convictions, comprised of the following categories of crimes:  person, property, weapons, and drug offenses.

Subsequently, one gunman directed the employees, including the victim, out a side door into an alley after seizing their wallets and cash receipts.  McCauley, 391 Mass. at 698-699.  In the alley, the gunman, later identified as the plaintiff, said to the victim, "I like you.  You think you're smart."  The gunman then raised the revolver and shot the victim between the eyes from within six inches.[13]  Id. at 699.  The plaintiff was arrested three days later.  Id. at 700.  At a hearing on a pretrial motion to suppress the statements he had made to police, the plaintiff testified that, from the time of the crime until the time of his arrest, "he had not slept and had ingested at various times amounts of alcohol, heroin, Valium, cocaine, and methadone."  Id. at 701.

3.  Plaintiff's medical condition.  According to the medical parole assessment conducted by Descoteaux and Moore, dated and updated January 4 and February 1, 2021, respectively, the plaintiff's medical conditions included chronic pain syndrome resulting from multiple failed back surgeries, spinal

---

[13] The employees testified that the shooter fired the gun with his right hand.  McCauley, 391 Mass. at 699.  The plaintiff told police that the shooting was an accident, and that he transferred the gun from his right to his left hand, causing the gun to fire accidentally because his hand was "paralyzed."  Id. A doctor testified that he had performed surgery on the plaintiff's left wrist five or six years earlier, which left the plaintiff with some numbness, but his hand was not "technically paralyzed."  Id.

stenosis,[14] migraine[15] headaches, benign prostatic hypertrophy (BPH),[16] severe neuropathy[17] confirmed by electromyography, abdominal wall incisional hernias,[18] and peripheral leg swelling secondary to varicose veins.  Descoteaux reported that the plaintiff's migraine headaches and BPH are controlled with medication.  His hernias cause him discomfort.  He has foot drop,[19] managed with a brace, related to permanent nerve damage. The swelling of his leg is treated with compression stockings.

---

[14] "Stenosis" is "[a] stricture of any canal or orifice," which, modified by "spinal," "[r]elating to any spine or spinous process" would mean a narrowing or restriction of the spine. Stedman's Medical Dictionary 1805, 1832 (28th ed. 2006).

[15] "Migraine" is defined as "[a] familial, recurrent syndrome characterized usually by unilateral head pain, accompanied by various focal disturbances of the nervous system, particularly in regard to visual phenomenon, such as scintillating scotomas."  Stedman's Medical Dictionary 1212.

[16] "Hypertrophy" is the "[g]eneral increase in bulk of a part or organ, not due to tumor formation."  Stedman's Medical Dictionary 929.

[17] "Neuropathy" is "a disease involving the cranial nerves or the peripheral or autonomic nervous system."  Stedman's Medical Dictionary 1313.

[18] A hernia is a "[p]rotrusion of a part or structure through the tissues normally containing it."  Stedman's Medical Dictionary 879.

[19] "Foot drop" is the "[p]artial or total inability to dorsiflex the foot."  Stedman's Medical Dictionary 756.

The plaintiff's ability to ambulate[20] is compromised severely due to his condition, and he requires the use of a walker for his unsteady gait, caused by neuropathy resulting from spinal stenosis.  A walker was assigned to him in 2014, when the department classified him as "handicapped."  In January 2020, the plaintiff reported that "[i]f it weren't for [his] walker, [he] would be falling a lot."  In February 2020, the plaintiff saw a neurosurgeon at Boston Medical Center.  The neurosurgeon recognized that "[h]is medical history is remarkable for [three] lumbar spine fusions," but determined that he was not a viable candidate for spinal cord stimulation due to the extent of his lumbar surgery.[21]  In October 2020, the plaintiff fell in his cell, injuring his shoulder, after his knee "gave out on him."  His unsteadiness is persistent, and he has fallen several times.  Despite his weakness, a Wellpath nursing progress note from July 2020 indicated that he was able to ambulate "with a steady gait with the assistance of a rollator walker without incident."

---

[20] Webster's Third New International Dictionary 67 (1993) defines "ambulate" as "to move from place to place."

[21] During a prior consultation with a doctor from Spaulding Rehabilitation Hospital, the doctor noted that the plaintiff was "able to walk without [an] assistive device," but expressed doubt that he would "have a good response to stimulation."

Given his limited mobility, several accommodations were made for the plaintiff at MCI-Norfolk.  In addition to his foot brace and his walker, he was given a knee sleeve (2004), first-floor housing close to the health services unit (2005), a bottom bunk (2006), a hernia belt (2017), and an extra mattress and pillows (2018).  Since 2017, an order has been on file that ankle restraints are not to be used on him, and he requires transport by a State car.

The plaintiff is prescribed "strong pain medication, which enables him to perform daily living activities."  The administrative record indicates that, at least as far back as May 2018, the plaintiff has been "maxed out in terms of his medications."  Among other things, he is prescribed oxycodone and morphine.

The plaintiff completed a comprehensive mental health evaluation with Wellpath in March 2020, during which he presented "anxious and depressive symptomology."  In 2008, while incarcerated, the plaintiff was placed on mental health watch after he made a "suicidal gesture."  Later, he stated that he made this gesture "while drunk on straight vodka."  He also was placed on mental health watch on October 21, 2013, after suffering a drug overdose in prison.[22]

---

[22] The evaluation lists several positive factors that the plaintiff possessed, including, among others, family support,

Both Descoteaux and Moore found that the plaintiff is "significantly and permanently incapacitated" due to his lumbar spinal stenosis for which neurological consultation offered no significant improvement, particularly considering his four prior back surgeries. This determination was characterized by his "permanent limitations and inability to walk unassisted" and indicated that he likely has been "incapacitated for months to years." Despite his significant medical conditions, including his neuropathy, which is "expected to worsen with advancing age," he was not expected to die within the next eighteen months from his known diagnoses.

4. Plaintiff's disciplinary history. The plaintiff's disciplinary history during his incarceration is extensive, but dated. It consists of refusing to provide urine; possession of controlled substances; "insolence"; possession of contraband, such as weapons and a syringe; participating in a drug transaction; acting as a lookout while other inmates used controlled substances; "accumulating meds"; an assault on a correction officer with a food tray; and destruction of State property. In September 1984, he was transferred after he was

---

positive peer relationships, positive goal orientation, and treatment compliance. It is worth noting, however, that the evaluation also indicates that the current charge or prior sentences did not relate to violent behavior, despite the plaintiff's conviction of murder in the first degree.

found to be in possession of valium. In May 1986, he tested positive for methadone. In December 1987, the plaintiff received a one and one-half year placement in the departmental segregation unit (DSU) for possessing six packets of marijuana and a syringe and being involved in a drug transaction with another inmate who possessed eighteen glassine packets of heroin. In August 1990, he was placed in the DSU for another year after he was found in possession of "an eight and a half inch pick-type weapon" concealed in his mattress. In July 1992, the plaintiff was transferred from MCI-Norfolk to Old Colony Correctional Center (Old Colony) because of his disruptive behavior. In December of that same year, he was sent to the Massachusetts Correctional Institution at Cedar Junction after he was found to be involved in illicit drug activity in Old Colony, during which he orchestrated the transfer of $850 from his friend to a recreation officer for the introduction of heroin into the facility. In June 1993, the plaintiff received a thirteen-month placement in the departmental disciplinary unit for this infraction.

Once back at MCI-Norfolk, in January 2007, he was reported for being out of place in a vacant, dark, and empty floor of the facility with another inmate. In September 2008, he cut a foam mattress and tested positive for alcohol on his arrival in the special management unit, and in October 2008, he was found in

possession of alcohol that he bought from another inmate. After he was transferred to the Souza-Baranowski Correctional Center in March 2009, he received positive reviews, did not incur any disciplinary reports, and attended Alcoholics Anonymous meetings and church services. In October 2013, after he had returned to MCI-Norfolk, he was taken to a local hospital for a medical emergency, and he admitted to consuming one-eighth of a piece of suboxone. In October 2014, he admitted to having a large piece of rock on his walker.

In February 2016, he admitted to damaging State property: another mattress. That same year in September, he admitted to being in possession of another inmate's headphones, and in November, he admitted to showering during an unauthorized time period.

Discussion. 1. <u>Legislative purpose and medical parole statute</u>. General Laws c. 127, § 119A, provides for a prisoner's ability to apply for, and be granted, medical parole where several requirements are met:

> "If the commissioner determines that a prisoner is terminally ill or permanently incapacitated such that if the prisoner is released the prisoner will live and remain at liberty without violating the law and that the release will not be incompatible with the welfare of society, the prisoner shall be released on medical parole."

G. L. c. 127, § 119A (<u>e</u>). "Permanent incapacitation" is defined by the statute as "a physical or cognitive incapacitation that

appears irreversible, as determined by a licensed physician, and that is so debilitating that the prisoner does not pose a public safety risk."  G. L. c. 127, § 119A (a).

The statute commands that the superintendent of a correctional facility "shall" consider a written petition for medical parole.  G. L. c. 127, § 119A (c) (1).  The superintendent "shall" transmit to the commissioner, along with a recommendation, three different items:  a medical parole plan, a written diagnosis by a physician licensed to practice medicine under G. L. c. 112, § 2, and "an assessment of the risk for violence that the prisoner poses to society."[23]

After receipt of a petition, the commissioner has forty-five days in which to issue a written decision.  G. L. c. 127, § 119A (e).  "If the commissioner determines that a prisoner is terminally ill or permanently incapacitated such that if the prisoner is released the prisoner will live and remain at liberty without violating the law and that the release will not be incompatible with the welfare of society, the prisoner shall be released on medical parole" (emphasis added).  Id.

The statute gives the Secretary of the Executive Office of Public Safety and Security (Secretary) the authority to promulgate rules and regulations necessary for the statute's

_____

[23] There are equivalent requirements for a sheriff.  G. L. c. 127, § 119A (d) (1).

enforcement. G. L. c. 127, § 119A (h). It also commands that the commissioner and Secretary file an annual report with the Legislature indicating information regarding those who applied for medical parole and those who were granted or denied medical parole, excluding any personally identifiable information. G. L. c. 127, § 119A (i).[24] If a prisoner, sheriff, or superintendent is aggrieved by the decision of the commissioner,

---

[24] Pursuant to the reporting requirement of § 119A (i), five annual reports have been released by the department regarding medical parole: for fiscal years 2018, 2019, 2020, 2021, and 2022. In 2018, five prisoners petitioned for medical parole, and none of them was released. Report Regarding Medical Parole Required by MGL Chapter 127 § 119A to the Clerks of the House and Senate, the Senate and House Committees on Ways and Means, and the Joint Committee for the Judiciary (Mar. 1, 2019), https://www.mass.gov/doc/fy18-doc-medical-parole-report/download [https://perma.cc/ND8G-4JQE]. In 2019, twenty-four prisoners petitioned for medical parole, and four were granted release. Report Regarding Medical Parole (Mar. 10, 2020), https://www .mass.gov/doc/fy19-doc-medical-parole-report/download [https: //perma.cc/JLR9-2N68]. In 2020, 270 prisoners petitioned for medical parole, twenty-six were released, and as of the report's release date, a total of fifty-two prisoners had been granted medical parole. Report Regarding Medical Parole (Dec. 1, 2021), https://www.mass.gov/doc/fy20-doc-medical-parole-report /download [https://perma.cc/9HN2-WL24]. In 2021, 211 prisoners petitioned for medical parole, seventeen were granted release, and a total of fifty-six inmates had been granted medical parole as of the date of the report. Report Regarding Medical Parole (Feb. 8, 2022), https://www.mass.gov/doc/fy21-doc-medical-parole-report/download [https://perma.cc/88DS-7GT5]. In 2022, sixty-seven prisoners petitioned for medical parole, seventeen were released, and as of the date of the report, sixty-nine total prisoners had been granted medical parole. Report Regarding Medical Parole (Dec. 1, 2022), https://www.mass.gov /doc/fy22-doc-medical-parole-report/download [https://perma.cc /5CX2-5LYR].

he or she may petition for relief in the nature of certiorari pursuant to G. L. c. 249, § 4 (§ 4).  G. L. c. 127, § 119A (g).

2.  Regulations.  Since promulgation by the Secretary on July 26, 2019, the original regulations have undergone several changes, in large part due to decisions from this court declaring them partially or wholly invalid.  On April 15, 2022, an updated version of the regulations became effective.[25]

At the time of the plaintiff's request for medical parole, the regulations provided that the superintendent's risk for violence assessment "shall" take several factors into consideration:  a prisoner's terminal illness or permanent incapacitation and prognosis; the prisoner's current housing situation; clinical management of the prisoner's medical condition; assessment for mobility, gait, and balance (considering the prisoner's confinement to bed or whether he or she is able to ambulate with the use of accommodations); any medically prescribed devices; the prisoner's ability to manage activities of daily living; a psychological assessment; advanced directives, such as a "do not resuscitate" order (DNR); and the prisoner's height, weight, and ability to eat on his or her own. 501 Code Mass. Regs. § 17.05 (2019).

---

[25] The definition for "permanent incapacitation" in the regulation is identical to the definition in the statute, with the exception of "and" before "that is so debilitating."  501 Code Mass. Regs. § 17.02 (2022).

The current version of the regulations indicates consideration of the same factors, minus the factor of advanced directives.  501 Code Mass. Regs. § 17.04(3) (2022).  The older version of the regulations, formerly at 501 Code Mass. Regs. § 17.03(7)(d) (2019), required the superintendent to transmit to the commissioner the assessment for the risk of violence, "which shall utilize standardized assessment tools that measure clinical prognosis, such as the LS/CMI assessment tool and/or COMPAS, as well as risk level for classification evaluation purposes."  The current version, 501 Code Mass. Regs. § 17.04(2)(d), (e) (2022), requires a multidisciplinary review team to provide information to the superintendent regarding the risk assessment, "which must be based upon the results of a standardized assessment tool that measures clinical prognosis, such as the LS/CMI assessment tool and/or COMPAS," in addition to a recent classification report.[26]

3.  Validity of 501 Code Mass. Regs. § 17.02.  a. Standard of review.  Where a statute authorizes the Secretary to promulgate rules and regulations to enforce and administer the statute, and where those regulations are duly promulgated, they "are presumptively valid."  Buckman v. Commissioner of Correction, 484 Mass. 14, 23 (2020), quoting Craft Beer Guild,

_____

[26] There is no further description of these tools in the regulation or the record.

LLC v. Alcoholic Beverages Control Comm'n, 481 Mass. 506, 520 (2019). "Only an 'agency regulation that is contrary to the plain language of the statute and its underlying purpose may be rejected by the courts.'" Massachusetts Teachers' Retirement Sys. v. Contributory Retirement Appeal Bd., 466 Mass. 292, 301 (2013), quoting Duarte v. Commissioner of Revenue, 451 Mass. 399, 408 (2008). We apply a deferential review of the regulation, "and it is therefore 'unimportant whether we would have come to the same interpretation of the statute as the agency.'" Massachusetts Teachers' Retirement Sys., supra, quoting Goldberg v. Board of Health of Granby, 444 Mass. 627, 633 (2005).

"[R]egulations are not to be declared void unless their provisions cannot by any reasonable construction be interpreted in harmony with the legislative mandate." Harmon v. Commissioner of Correction, 487 Mass. 470, 476 (2021), quoting Dowell v. Commissioner of Transitional Assistance, 424 Mass. 610, 613 (1997). "Our deference is especially appropriate where, as here, the statute[] in question involve[s] an explicit, broad grant of rule-making authority." Goldberg, 444 Mass. at 634.

We employ a two-step test to evaluate the legality of an agency's regulations. Harmon, 487 Mass. at 476. We first look to statutory language. Id. at 476-477. Where the statute

"speaks clearly on the topic in the regulation, we determine whether the regulation is consistent with or contrary to the statute's plain language." Buckman, 484 Mass. at 24. Where the relevant statute is ambiguous or leaves a gap in statutory guidance, we move to the second step, to "determine whether the regulation may 'be reconciled with the governing legislation.'" Id., quoting Craft Beer Guild, LLC, 481 Mass. at 520. "Statutory silence, like statutory ambiguity, often requires that an agency give clarity to an issue necessarily implicated by the statute but either not addressed by the Legislature or delegated to the superior expertise of agency administrators." Goldberg, 444 Mass. at 634.

b.  Analysis.  Here, the plaintiff argues that 501 Code Mass. Regs. § 17.02 is invalid because its definition of "debilitating condition" impermissibly narrows the class of persons available for medical parole, by limiting availability to those who are unable to conduct basic activities of daily living.  He asserts that the statute's use of the term "debilitating" is "unambiguous," as it is modified by the phrase "that the prisoner does not pose a public safety risk."  The defendants argue that the regulation is valid because it reasonably fills a gap in the statute, which does not expressly define "debilitating" and includes a further description of the meaning of "debilitating."  We first examine whether the statute

is unambiguous with respect to its reference to "debilitating" conditions.

The statute defines "permanent incapacitation" as "a physical or cognitive incapacitation that appears irreversible, as determined by a licensed physician, and that is so debilitating that the prisoner does not pose a public safety risk" (emphasis added).  G. L. c. 127, § 119A (a).  It further defines "terminal illness" as "a condition that appears incurable, as determined by a licensed physician, that will likely cause the death of the prisoner in not more than [eighteen] months and that is so debilitating that the prisoner does not pose a public safety risk" (emphasis added).  Id. Those are the only two occasions where the word "debilitating" appears in the statute.

Typically, "[w]hen a statute does not define its words we give them their usual and accepted meanings, as long as these meanings are consistent with the statutory purpose. . . .  We derive the words' usual and accepted meanings from sources presumably known to the statute's enactors, such as their use in other legal contexts and dictionary definitions."  Williams v. Board of Appeals of Norwell, 490 Mass. 684, 693-694 (2022), quoting Commonwealth v. Morasse, 446 Mass. 113, 116 (2006).

Where, however, as here, the statute expressly provides the power to the Secretary to "promulgate rules and regulations

necessary for the enforcement and administration" of the statute, the Secretary's interpretation of an important, undefined word, particularly where other important words and phrases are defined by the statute, warrants some deference. G. L. c. 127, § 119A (h). "[I]f the Legislature has not addressed directly the pertinent issue [in the statute], we determine whether the agency's resolution of that issue may 'be reconciled with the governing legislation.'" Zoning Bd. of Appeals of Amesbury v. Housing Appeals Comm., 457 Mass. 748, 759-760 (2010), quoting Goldberg, 444 Mass. at 633. At this stage in the analysis, we apply "'substantial deference' to the expertise and statutory 'interpretation of [the] agency charged with primary responsibility' for administering a statute. . . . [A] '[S]tate administrative agency in Massachusetts has considerable leeway in interpreting a statute it is charged with enforcing,' unless a statute unambiguously bars the agency's approach." Zoning Bd. of Appeals of Amesbury, supra, quoting Goldberg, supra.

The fact that the word "debilitating," in the statute, is modified by the phrase "that the prisoner does not pose a public safety risk" does not foreclose the Secretary, tasked with enforcement and administration of the statute, from further defining the term, and attempting to answer the unanswered question: in what instance would someone be so debilitated that

he or she would not pose a public safety risk?  This is particularly true where the statute declines to define "public safety risk."  The importance of defining what "debilitates" someone to the point where he or she no longer poses a "public safety risk" is significant.  A more detailed definition of "debilitating" facilitates the administration of the statute by providing objective criteria that can be applied consistently from petition to petition in making a determination whether an individual poses a risk to public safety.

Taking into consideration the statute's mandate that the Secretary promulgate regulations to enforce and administer the medical parole process, and given the fact that the statute defines "permanent incapacitation" and "terminal illness," the Legislature's silence on the definition of "debilitating" indicates that the Secretary had the discretion to identify factors that would assist the superintendent in determining whether a prisoner has a debilitating condition.  See, e.g., Massachusetts Teachers' Retirement Sys., 466 Mass. at 300.  We "view the Legislature's silence here as an invitation to [the Secretary] to fill the gap with appropriate regulation."  Id. at 301.

Next, where the statute leaves a gap for the Secretary to fill, we must "determine whether the regulation may 'be reconciled with the governing legislation.'"  Buckman, 484 Mass.

at 24, quoting Craft Beer Guild, LLC, 481 Mass. at 520 ("Where the statute relevant to the regulation is ambiguous or where there is a gap in the statutory guidance, we" move on to next step in our analysis of regulation).  The regulation defines "debilitating condition" as

> "[a] physical or cognitive condition that appears irreversible, resulting from illness, trauma, and/or age, which causes a prisoner significant and serious impairment of strength or ability to perform daily life functions such as eating, breathing, toileting, walking or bathing so as to minimize the prisoner's ability to commit a crime if released on medical parole, and requires the prisoner's placement in a facility or a home with access to specialized medical care" (emphasis added).[27]

501 Code Mass. Regs. § 17.02.  The plain reading of the regulation is consistent with the legislative purpose of the statute to show compassion to those individuals who are least likely to offend, considering the poor health and age of the prisoner, while also considering savings in costs of health care for those who need serious care.  The plain language of the regulation does not require that a prisoner be incapable of performing all daily life functions, but some daily life functions.

---

[27] We discuss the regulation in effect at the time of the plaintiff's request for medical parole, with the understanding that the regulation has undergone minor changes.  The updated version, effective April 15, 2022, removed the language "resulting from illness, trauma, and/or age," and added "palliative or" before "medical care."  501 Code Mass. Regs. § 17.02 (2022).

Contrary to the plaintiff's assertion that the regulation "redefined" the term "so debilitating" by limiting it to a question of ability to perform activities of daily living, the language used in the regulation indicates that the activities mentioned are examples for the commissioner to consider rather than an exclusive list.  Webster's Third New International Dictionary 2283 (2002) defines "such" as "someone or something that has been or is being stated, implied, or exemplified," and "such a one" as "one of a kind to be indicated or specified." Interpreting this phrase in the regulation according to its definition, the regulation does not limit daily life functions to those mentioned, but rather provides examples of what some daily life functions may be.  Accordingly, we remind the commissioner that a reasonable interpretation of the regulation would not require a prisoner to be unable to perform all activities of daily living, but only those that diminish the public safety risk a prisoner poses on release.

We do not agree with the plaintiff that consideration of the ability to perform activities of daily living is not "logically related" to the determination whether a medical condition is "debilitating."  G. L. c. 127, § 119A (a). "Debilitate" is defined as "to weaken, . . . to impair the strength of."  Webster's Third New International Dictionary 582. As such, the regulation's discussion of ability to perform daily

life functions reasonably flows from the language used within the statute.  We can conclude that, by using the word "debilitating" in defining both "terminal illness" and "permanent incapacitation," the Legislature contemplated an individual's weakened ability to function.

The plaintiff further argues that the regulation "serves to narrow the class of persons available for medical parole."  That the regulation provides examples of particular daily life functions does not reduce the number of persons who otherwise would qualify under the statute.  To the contrary, the regulation demonstrates the Secretary's appropriate use of expressly granted power to "promulgate rules and regulations necessary for the enforcement and administration of" the statute to provide guidelines to the commissioner in determining when individuals may suffer from a "debilitating" condition.  G. L. c. 127, § 119A (h).[28]

---

[28] Consideration of the ability to perform activities of daily living is contemplated in other statutes when defining similar terms.  General Laws c. 151B, § 1 (17), the unlawful discrimination code, defines "handicap" as "a physical or mental impairment which substantially limits one or more major life activities of a person," among other considerations (emphasis added).  In the same statute, "major life activities" are defined as "functions, including, but not limited to, caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working."  G. L. c. 151B, § 1 (20).  Similarly, 42 U.S.C. § 12102(1), the Federal equivalent, defines "disability" as, in part, "a physical or mental impairment that substantially limits one or more major life activities of such individual."  Title 42 U.S.C. § 12102(2)

Although statutes from other States allowing for some form of medical parole are written and implemented differently, several of those statutes and regulations use language discussing activities of daily living similar to our own. California's medical parole statute provides for release in certain circumstances for prisoners who are "permanently medically incapacitated with a medical condition that renders [them] permanently unable to perform activities of basic daily living." Cal. Penal Code § 3550(a). The regulation expands on this by identifying several activities of daily living: "breathing, eating, bathing, dressing, transferring, elimination, arm use, or physical ambulation." 15 Cal. Code Regs. § 3359.1(a)(1). See In re Martinez, 210 Cal. App. 4th 800, 817-818 (2012) (discussing considerations that are part of medical parole decision and stating that determination of whether inmate is "permanently medically incapacitated" as set forth in statute is "more explicitly defined" in regulations). The New Jersey medical parole statute defines "permanent physical incapacity" as a medical condition that renders one "permanently unable to perform activities of basic daily

---

defines "major life activities" as including, but not limited to, "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working."

living."  N.J. Stat. Ann. § 30:4-123.51e.  Neither the regulation nor the statute defines "activities of basic daily living."  N.J. Admin. Code § 10A:16-8.5.  See State v. F.E.D., 251 N.J. 505, 511, 528 (2022) (construing statute "to require clear and convincing evidence that the inmate's condition renders him permanently unable to perform two or more activities of basic daily living, necessitating twenty-four-hour care" and looking to other laws in New Jersey that define "activities of basic daily living" to determine how to define it for medical parole purposes).  See also Ohio Rev. Code Ann. § 2967.05 & Ohio Admin. Code 5120:1-1-40 (statute states "medically incapacitated" includes consideration of disability that "prevents the inmate from completing activities of daily living without significant assistance," regulation sets out procedural process, and neither defines "activities of daily living").[29]

Although Montana's medical parole statute does not use the language "activities of daily living," the administrative rules identify factors the decision-making body may consider.  See Mont. Code Ann. § 46-23-210; Mont. Admin. R. 20.25.307.  See

---

[29] Other jurisdictions whose medical parole statutes mention activities of daily living include Rhode Island (R.I. Gen. Laws § 13-8.1-3), Colorado (Colo. Rev. Stat. § 17-1-102), Kentucky (Ky. Rev. Stat. Ann. § 439.3405), Louisiana (La. Rev. Stat. Ann. § 15:574.20), Michigan (Mich. Comp. Laws § 791.235), Mississippi (Miss. Code Ann. § 47-7-4), and Oklahoma (Okla. Stat. tit. 57, § 332.18).

also Madsen vs. Guyer, No. 18-0699 (Mont. Dec. 27, 2018) (medical parole "defined by statute"); Holm vs. Salmonsen, No. 18-0557 (Mont. Oct. 16, 2018) (directing plaintiff to administrative rules concerning medical parole to provide guidance). In Kansas, the medical parole statute lists factors to consider in determining whether a person is "functionally incapacitated." Kan. Stat. Ann. § 22-3728(a)(8). The regulations direct the decision-making party to consider the factors identified in the statute, "and the following additional factors[,]" naming the prisoner's age, medical condition, health care needs, custody classification, risk of violence, and effective capacity to cause physical harm as additional relevant factors. Kan. Admin. Regs. § 45-700-2(b)(1)(C). The statutes and regulations of these other States support our determination that consideration of ability to perform activities of daily living correlates with an individual's permanent incapacitation.

Because § 119A contemplates cognitive incapacitation, we must address whether the regulation impermissibly excludes those who suffer from a qualifying cognitive condition in determining whether the regulation is valid. G. L. c. 127, § 119A (a) (defining "permanent incapacitation"). The proper interpretation of this regulation, which contemplates a "cognitive condition," would not lead to the exclusion of those who are eligible for medical parole by reason of cognitive

incapacitation.  As discussed supra, the use of "such as" in the regulation indicates that the daily life functions mentioned in the statute are only examples of what may contribute to qualifying someone for medical parole.

Consideration of other daily life functions, such as thinking, planning, concentrating, and working, may be more applicable when examining prisoners who are cognitively incapacitated, along with other daily life functions that are explicitly indicated in the regulations.  Indeed, functions such as thinking, planning, concentrating, or working may have an impact on the daily life functions that explicitly are indicated in the regulations, such as ability to breathe, eat, or walk on one's own.  We list other potential daily life functions solely to provide an illustration of those that may be connected to cognitive incapacitation.

Notably, in response to questioning at oral argument, counsel for the defendants later submitted thirteen medical parole decisions in which the commissioner released petitioners on medical parole who suffered from various forms of cognitive incapacitation, such as dementia and Alzheimer's disease.[30]  In four of those decisions, the commissioner released petitioners primarily suffering from dementia, recognizing that it had an

---

[30] Only one of those decisions was a result of a remand following judicial review.

impact on those petitioners' comprehension, reasoning, judgment, memory, and insight.  In two petitions, the commissioner specifically noted that despite needing prompting, the petitioners still were able to perform all or most physical activities of daily living independently, but released them nonetheless due to their cognitive incapacities.

We advise the commissioner to continue to analyze each petition individually, and to consider all activities of daily living, including those that could be implicated by cognitive incapacitation, not just those enumerated in the regulation as examples, as she appeared to do properly in the petitions discussed in the preceding paragraph.  Giving substantial deference, as we must, to the Secretary, the statute "may 'be reconciled with the governing legislation.'"  Buckman, 484 Mass. at 24, quoting Craft Beer Guild, LLC, 481 Mass. at 520.

After considering whether a prisoner petitioning for medical parole has an irreversible physical or cognitive condition, as set out by 501 Code Mass. Regs. § 17.02 and the statute, the commissioner then must consider whether this condition is so debilitating that the prisoner "does not pose a public safety risk," § 119A, and "minimize[s] the prisoner's ability to commit a crime if released," 501 Code Mass. Regs. § 17.02.

Contrary to the plaintiff's assertion that the ability to perform activities of daily living is disconnected from an individual's risk to public safety, those who suffer from conditions that prevent or hinder their performance of certain activities of daily living are objectively less likely to pose a public safety risk, making it an appropriate consideration in determining whether to release a prisoner on medical parole. It is difficult to neatly describe the nexus between physical incapacitation and the inability to commit a crime. Different debilitating conditions likely would incapacitate an individual in different ways. For example, a petitioner who is quadriplegic likely would not be able to shoot a gun, and a petitioner who cannot walk may not be able to rob a bank. Activities of daily living that may be hindered in those cases may include, among others, bathing and walking, which are listed explicitly in 501 Code Mass. Regs. § 17.02.

A petitioner who suffers from severe dementia may have difficulty writing a "bad" check or robbing a bank. For that individual, the activities of daily living he or she may have difficulty performing may include speaking, thinking, reading, writing, or expressing thoughts that, in turn, may implicate the functions mentioned in 501 Code Mass. Regs. § 17.02, such as eating, breathing, or toileting. The regulation's discussion of activities of daily living does not narrow impermissibly the

scope of the statute; rather, it facilitates the statute's administration in a consistent manner by aiding in the determination of when a prisoner's condition may implicate the risk posed to public safety on his or her release.

The Supreme Court of New Jersey recently endeavored to construe two requirements of its medical parole statute:  that a prisoner be "permanently physically incapable of committing a crime if released" and "would not pose a threat to public safety."[31]  F.E.D., 251 N.J. at 531, quoting N.J. Stat. Ann. § 30:4-123.51e(f)(1).  The court reasoned that the "physically incapable" language could not require that a prisoner be incapable of committing any criminal offense, because, in that case, "only an inmate who is so debilitated or incapacitated that he cannot speak with a co-conspirator to plan a crime or type on a computer to commit an offense could be eligible for compassionate release," which would contravene the intent of the Legislature and render superfluous the language regarding a threat to public safety.  F.E.D., supra at 531-532.  For a prisoner asserting a "permanent physical incapacity," in order for the "public safety" requirement to have meaning, the court interpreted the "physically incapable" language to mean whether

---

[31] New Jersey's medical parole statute is unique in that it allows a court to determine whether a prisoner qualifies for compassionate release.  N.J. Stat. Ann. § 30:4-123.51e.

the prisoner is physically incapable, either alone or with assistance, of committing the same crime or similar crimes to those of which he or she was convicted. Id. at 532-533. Then, in analyzing the public safety risk the prisoner presents, the "inquiry is not limited to the threat that the inmate may commit any specific crime or category of crimes," but instead involves a "comprehensive assessment" of all the relevant factors. Id. at 533.

Our statute is not so limiting; it requires a determination not that the prisoner is "physically incapable" of violating the law, but that he or she "will live and remain at liberty without violating the law" and that the prisoner's release is not "incompatible with the welfare of society." G. L. c. 127, § 119A (e). Both prongs require a more comprehensive look, on a case-by-case basis, at various considerations. The regulations and the statute do not explicitly list the factors that the commissioner should consider in making this determination, unlike the medical parole statutes and regulations of some other States.[32]

---

[32] For example, Montana's administrative rules provide factors to consider in the public safety analysis, such as whether a prisoner's physical condition renders him or her unable to engage in criminal activity, any statement from the victim, the progression of his or her medical condition documented by a licensed physician, a prisoner's "conduct, employment, and attitude" in prison, any physical or mental evaluations that have been completed, a prisoner's social and

Nonetheless, in addition to the ability to perform activities of daily living, the commissioner's decision should include discussion of the following factors:  a written diagnosis from a licensed physician (501 Code Mass. Regs. § 17.04); any proposed medical parole plan (same); a risk for violence assessment, which should consider all the circumstances mentioned supra (same); a classification report (same); the superintendent's recommendation (same); and written statements and opinions submitted by a district attorney, victim, or family member of a victim (501 Code Mass. Regs. § 17.06).[33]  The superintendent's recommendation, risk for violence assessment, or classification report, as in this case and in Carver v. Commissioner of Correction, 491 Mass.    (2023), may incorporate the prisoner's disciplinary record and the severity of his or her crime, which may in turn be considered by the commissioner in making a decision.[34]  The commissioner's

---

criminal record, and the circumstances of the offense for which a prisoner is incarcerated.  Mont. Admin. R. 20.25.307.

[33] We cite the factors where they appear in the current version of the regulations.

[34] Title 103 Code Mass. Regs. § 420.08 (2017) discusses factors to consider in the reclassification of prisoners, including, but not limited to, the prisoner's criminal history, the personalized program plan, work and housing evaluations, disciplinary history, and segregation placements.  Thus, where 501 Code Mass. Regs. § 17.04 specifically mentions the provision of a classification report to the commissioner, she may consider the information contained within that report.

determination as to whether a prisoner is so debilitated that he or she does not pose a public safety risk should result from a comprehensive approach, considering all the factors implicated by the particular case.

4. Denial of plaintiff's petition. a. Standard of review. "The standard of review for a certiorari action depends on the nature of the action for which review is sought." Mederi, Inc. v. Salem, 488 Mass. 60, 67 (2021). "[W]here, as here, the decision being reviewed implicates the exercise of administrative discretion, the court applies the 'arbitrary or capricious' standard, which is more deferential to the party defending the administrative action it took." Id., quoting Revere v. Massachusetts Gaming Comm'n, 476 Mass. 591, 605 (2017).[35] This standard is generous to the decision-making

---

[35] The medical parole process is not "adjudicatory." For example, the Administrative Procedure Act "defines '[a]djudicatory proceeding' as 'a proceeding before an agency in which the legal rights, duties or privileges of specifically named persons are required by constitutional right or by any provision of the General Laws to be determined after opportunity for an agency hearing'" (emphasis added). Milligan v. Board of Registration in Pharmacy, 348 Mass. 491, 494 (1965), quoting G. L. c. 30A, § 1 (1). Section 119A permits a hearing where the prisoner was charged with a particular crime and the district attorney or victim's family requests it. G. L. c. 127, § 119A (c) (2). Title 501 Code Mass. Regs. § 17.07 (2022) allows the commissioner to hold a hearing, but does not require her to, and largely leaves the procedure and permissible attendees of the hearing to the discretion of the commissioner; she "shall not be bound by the laws of evidence observed by the courts of the Commonwealth." "Unless an adjudicatory hearing is required by constitutional right or statute, the fact that some

party, and only requires "that there be a rational basis for the decision." Mederi, supra.

The commissioner does not have unbridled discretion. The statute demands:

> "The commissioner shall issue a written decision . . . .
> If the commissioner determines that a prisoner is
> terminally ill or permanently incapacitated such that if
> the prisoner is released the prisoner will live and remain
> at liberty without violating the law and that the release
> will not be incompatible with the welfare of society, the
> prisoner shall be released on medical parole" (emphasis
> added).

G. L. c. 127, § 119A (e). Nonetheless, the commissioner has discretion, as set out by statute, to determine whether the prisoner meets the three criteria set out by statute, namely, (1) whether the prisoner is terminally ill or permanently incapacitated such that (2) he or she will live and remain at liberty without violating the law, and (3) that release will not be incompatible with the welfare of society. Id. "The medical parole statute vests the commissioner with the authority to grant medical parole and requires the commissioner to do so where the commissioner finds that certain conditions have been met." Emma v. Massachusetts Parole Bd., 488 Mass. 449, 455 (2021).

---

type of hearing is permitted or required does not imply that it is adjudicatory. We must look to the nature of the proceeding below." Sierra Club v. Commissioner of the Dep't of Envtl. Mgt., 439 Mass. 738, 746 (2003).

Although the commissioner "shall" release the prisoner when she finds that the three criteria are satisfied, the discretion that she retains in determining whether the prisoner meets those criteria should not be disregarded. Particularly, the second two prongs -- whether the prisoner will live and remain at liberty without violating the law, and whether the prisoner's release will be incompatible with the welfare of society -- are, as discussed supra, comprehensive fact-intensive questions that leave room for differences in opinion among those analyzing the same record. The commissioner's discretion is not a small component of the criteria to be applied; to the contrary, prisoners are released under the statute in her discretion alone, on her consideration of the factors mentioned by the statute or the regulations. G. L. c. 127, § 119A (e) ("If the commissioner determines . . ." [emphasis added]). In light of the discretionary nature of these determinations, an "arbitrary or capricious" standard is appropriate. Compare Diatchenko v. District Attorney for the Suffolk Dist., 471 Mass. 12, 31 (2015) (Diatchenko II) ("Because the decision whether to grant parole to a particular juvenile homicide offender is a discretionary determination by the board, . . . an abuse of discretion standard is appropriate"), Sierra Club v. Commissioner of the Dep't of Envtl. Mgt, 439 Mass. 738, 745-748 (2003) (applying arbitrary or capricious standard to commissioner's findings

where nonadjudicatory process and exercise of powers and duties delegated to him for purpose of implementing legislative policy), and Forsyth Sch. for Dental Hygienists v. Board of Registration in Dentistry, 404 Mass. 211, 217 (1989) (applying arbitrary and capricious standard of review because "board is free to use its judgment in determining when and to whom to grant exemptions from its regulations" in exercise of its administrative discretion), with Black Rose, Inc. v. Boston, 433 Mass. 501, 503-505 (2001) (reviewing decision suspending entertainment license under substantial evidence test, relying on cases applying that standard to license revocation proceedings under same statute), Saxon Coffee Shop v. Boston Licensing Bd., 380 Mass. 919, 924-925 (1980) (applying substantial evidence test to revocation of common victualler's license as revocation proceedings are required by statute and adjudicatory in nature), Lovequist v. Conservation Comm'n of Dennis, 379 Mass. 7, 8, 17-18 (1979) (reviewing decision of town conservation commission denying application to construct access road over old cranberry bog under substantial evidence standard), and Boston Edison Co. v. Boston Redev. Auth., 374 Mass. 37, 50-54 (1977) (substantial evidence test appropriate where projects approved under G. L. c. 121A primarily are "conceived of and implemented by" private corporations who receive large public benefits and where tendency exists to

review "in more depth the decisions of urban renewal agencies").

Where this discretion explicitly is conferred on the

commissioner by the Legislature, we must give the commissioner's

decision regarding the release of a prisoner under the statute

deference.[36]  See, e.g., Ciampi v. Commissioner of Correction,

452 Mass. 162, 168 (2008) ("Each of the challenged regulations

and policy is entirely within the commissioner's broad grant of

authority . . . to maintain prison discipline and is consistent

with the Legislature's intent"); G. L. c. 27, § 5 (granting

parole board power to determine who shall be released on

parole).

b.  Analysis.  The plaintiff argues that the commissioner's

decision to deny him medical parole was erroneous because the

department did not conduct a risk assessment on him; he does not

have a history of institutional violence; his disciplinary

history is not extensive, and was heavily drug-related, which

ceased when he was prescribed pain medication; his ability to

move around with a walker does not make him a threat to the

---

[36] The defendants argue that the plaintiff's assertion that
the commissioner's decision is due no deference was raised for
the first time on appeal.  Arguably, the plaintiff raised this
in his motion for judgment on the pleadings where he stated:
"The [c]ommissioner's expertise is limited to institutional
order alone, and the deference required to be given to the
[c]ommissioner's judgment on issues of public safety . . . is
minimal."  Nonetheless, we conclude that this argument has no
merit.

public; and the accommodations he has been given in prison should not have been considered. The defendants counter that the commissioner's decision was not arbitrary or capricious, because her determination that the plaintiff is not so "permanently incapacitated" within the meaning of the medical parole statute that he "does not pose a public safety risk" was reasonable in light of the record. The defendants point to the plaintiff's physical ability to conduct daily living activities, with the assistance of the restrictions put in place by the prison, and argue that a risk assessment that satisfies the statute was conducted by the superintendent in his recommendation letter.

At the outset, and as discussed supra, § 119A requires the commissioner to determine three things: whether the prisoner is (1) "terminally ill or permanently incapacitated such that" (2) "if the prisoner is released the prisoner will live and remain at liberty without violating the law" and (3) "that the release will not be incompatible with the welfare of society." G. L. c. 127, § 119A (e). The definition of permanent incapacitation in the statute refers to "a physical or cognitive incapacitation that appears irreversible" and "that is so debilitating that the prisoner does not pose a public safety risk." G. L. c. 127, § 119A (a). Given this language, it appears that the commissioner must consider, generally, whether

a prisoner is likely to abide by the law.  Additionally, the commissioner must consider the public safety risk imposed by the prisoner's release.  The third prong of subsection (e) appears to subsume the "public safety risk" concern; if an individual's release poses a public safety risk, then naturally his or her release is incompatible with the welfare of society.  It is with this standard in mind that we consider whether the commissioner's decision in the plaintiff's case was arbitrary or capricious.

An "assessment of the risk for violence that the prisoner poses to society" is required by § 119A.  G. L. c. 127, § 119A (c) (1), (d) (1).  Despite its mention in the statute, only the regulations specify what that assessment should entail.  As discussed supra, at the time of the plaintiff's request for medical parole, 501 Code Mass. Regs. § 17.05 indicated that the risk for violence assessment conducted by the supervisor must take several factors into consideration, including the prisoner's medical condition, management of that medical condition, the prisoner's housing situation, assessment of the prisoner's ability to ambulate with or without accommodation, medical devices prescribed for the prisoner, the prisoner's ability to manage daily living activities, a psychological assessment, advanced directives or DNR, and the prisoner's physical characteristics and his or her ability to eat

independently. Additionally, 501 Code Mass. Regs. § 17.03(7)(d) required the superintendent to transmit a risk for violence assessment utilizing "standardized assessment tools . . . , such as the LS/CMI assessment tool and/or COMPAS, as well as risk level for classification evaluation purposes."

Although the classification report was provided, there is nothing in the record to indicate that the superintendent used "standardized assessment tools . . . , such as the LS/CMI assessment tool and/or COMPAS." In fact, the superintendent stated in his recommendation:

> "Regarding the required assessment of the risk for violence that the inmate poses to society . . . , I have enclosed for your review a copy of [the plaintiff's] most recent Classification Board and Personalized Program Plan. Due to his sentence of life without parole, he does not receive a Risk or Needs Assessment, therefore, one could not be provided" (emphasis added).

A risk for violence assessment is required by the regulation, as evidenced by the word "shall."[37] The superintendent must follow the specific requirements as promulgated by the Secretary. In this case, Silva (or the multidisciplinary review team, as

---

[37] In the current version, 501 Code Mass. Regs. § 17.04(2)(d) uses the phrase "must be based upon" when referring to a standardized assessment tool. See 501 Code Mass. Regs. § 17.04(2)(d) ("a risk for violence assessment, which must be based upon the results of a standardized assessment tool that measures clinical prognosis, such as the LS/CMI assessment tool and/or COMPAS"). As the parties did not raise the issue of the validity of this regulation, we assume without deciding that it is valid for the purposes of our analysis.

mentioned in the current regulation) should have ensured that a risk assessment, based on a standardized assessment tool, was conducted in order to comply with the regulations. If the plaintiff had not received a risk for violence assessment based on a standardized assessment tool as specified in the regulation, the superintendent needed to facilitate such an assessment before he sent his recommendation to the commissioner. When the commissioner reviewed the record and saw that it had not been completed, she should have inquired further about obtaining such an assessment.[38]

Silva did address many of the factors set out by the regulation in his recommendation. He discussed the plaintiff's medical condition, the medical assessments performed by department physicians, the accommodations put in place to assist the plaintiff in conducting daily living activities -- including his housing placement -- and the plaintiff's ability to ambulate, as viewed by prison staff. He also discussed the medical parole plan developed by the plaintiff, and provided the classification report to the commissioner. A number of these

---

[38] We recognize that the strict timeline set out by the statute in processing petitions for medical parole may make it difficult to conduct assessments that have not yet been administered. See G. L. c. 127, § 119A (c) (1) (superintendent shall send recommendation not more than twenty-one days after receipt of petition). Even so, the regulation, drafted by the Secretary, requires such an assessment.

factors specifically were mentioned in 501 Code Mass. Regs.
§ 17.05 at the time of the plaintiff's petition, and therefore
are proper to consider in determining whether the absence of the
standardized assessment invalidated the commissioner's decision.
Nonetheless, the statute requires an assessment for the risk of
violence that the prisoner poses to society, and the regulations
specify that this must be based on a standardized assessment
tool.  See G. L. c. 127, § 119A (h) (Secretary to promulgate
regulations "necessary for the enforcement and administration of
this section").  Although the commissioner had a classification
report, a recommendation from the superintendent, and other
documentation that comprehensively catalogued the plaintiff's
medical condition, his substance use concerns, his convictions,
and his disciplinary history, the absence of the standardized
risk assessment required by the regulation compels us to remand
the petition for reconsideration after such an assessment is
conducted.[39]  Despite the fact that a standardized risk

_____

[39] We may not presume that the "[r]isk [a]ssessment" defined
in the regulations pertaining to classification of prisoners is
the equivalent of the "risk for violence" assessment required by
the medical parole statute in the absence of any language in the
medical parole regulations referencing this definition, despite
the superintendent's mention of a "Risk or Needs Assessment."
See 103 Code Mass. Regs. § 420.05 (defining risk assessment as
"[t]he identification, evaluation, and estimation of the levels
of criminogenic risk factors which are characteristic of an
inmate or his or her situation which then assist in predicting
future criminal behavior").  Contrast 501 Code Mass. Regs.
§ 17.04(2)(d) (2022) ("a risk for violence assessment, which

assessment is but one relevant factor that the commissioner could have considered in making her decision, it is a consideration required by the regulation, and we cannot acquiesce to its absence.

Notwithstanding our conclusion that the petition must be remanded for the administration and consideration of a risk for violence assessment based on a standardized assessment tool, we analyze the commissioner's consideration of the other factors that are disputed by the parties. "A decision is not arbitrary and capricious unless there is no ground which 'reasonable [persons] might deem proper' to support it." Garrity v. Conservation Comm'n of Hingham, 462 Mass. 779, 792 (2012), quoting T.D.J. Dev. Corp. v. Conservation Comm'n of N. Andover, 36 Mass. App. Ct. 124, 128 (1994). The commissioner's consideration of other factors discussed infra was reasonable given the entire administrative record.[40]

---

must be based upon the results of a standardized assessment tool that measures clinical prognosis, such as the LS/CMI assessment tool and/or COMPAS").

[40] That the district attorney's office opined that the plaintiff should be released does not render the commissioner's decision an abuse of discretion. Although the opinion of the relevant district attorney is a factor provided for in the regulations, the commissioner alone has the discretion to decide whether a prisoner qualifies for medical parole. See G. L. c. 127, § 119A (e); 501 Code Mass. Regs. § 17.06(2) (2022).

One of the factors that the commissioner properly considered was the plaintiff's disciplinary history, as indicated in his classification report and described in the superintendent's recommendation. The plaintiff's early years of incarceration were marked with extensive disciplinary violations, resulting in numerous transfers of correctional facilities due to his behavior. Although many of those violations were drug and alcohol related, some of them could be characterized as "violent," namely, the report of his assault on a correction officer, his possession of "an eight and a half inch pick-type weapon," and his having a large piece of rock on his walker in 2014. Although these infractions are not recent, it was not unreasonable to consider them. We may not substitute our judgment as to the weight or value of the infractions for that of the commissioner. Cf. Diatchenko II, 471 Mass. at 30 ("The purpose of judicial review here is not to substitute a judge's or an appellate court's opinion for the board's judgment on whether a particular juvenile homicide offender merits parole, because this would usurp impermissibly the role of the board").

Similarly, it was not unreasonable to consider the plaintiff's ability to perform seemingly all his daily life functions using the accommodations provided to him, another factor mentioned by the regulations. This indicates that he is

not bedridden and that he is able to perform tasks on his own, which is relevant to his ability to "violat[e] the law" on his release. G. L. c. 127, § 119A (e). As discussed supra, a person who is confined to bed and unable to perform any tasks on his or her own would be less able to violate the law than one able to move around with a walker. This is not to say that those who can perform some activities of daily living on their own may not be released on medical parole. Nonetheless, the consideration of this ability is a factor pertinent to the commissioner's decision. The record indicated that a correction officer observed the plaintiff walking "outside a lot with a rollator [walker], at times quickly." It is not the fact that accommodations were provided to the plaintiff that is relevant, but his ability to function independently in society with proper accommodations.

Further, it was not an abuse of discretion to consider the severity and the facts of the plaintiff's crime for which he is incarcerated as a factor in determining whether he would be a risk to the safety of the public, which was included in both his classification report and the superintendent's recommendation. The statute does not exclude those who have been convicted of murder in the first degree from receiving medical parole. G. L. c. 127, § 119A. Nonetheless, where someone has been convicted of the most serious crime, punished by a mandatory sentence of

life without the possibility of parole, the facts of that crime are relevant to the determination whether the person will be a risk to the safety of the public on release. G. L. c. 265, § 2 (a) (if convicted of murder in first degree, person "shall be punished by imprisonment in the [S]tate prison for life and shall not be eligible for parole").

Given the purpose of medical parole, a petitioner's refusal to admit guilt should not be counted against him in the medical parole context.[41] See, e.g., Deal v. Massachusetts Parole Bd., 484 Mass. 457, 469-470 (2020) (Gants, C.J., concurring), quoting Quegan v. Massachusetts Parole Bd., 423 Mass. 834, 837 (1996) ("although we did not reach the question, we recognized that due process might forbid 'denial of parole solely because a prisoner, who was otherwise fully qualified for release on parole, did not acknowledge his guilt'"); Commonwealth v. Mills, 436 Mass. 387, 400 & n.9 (2002) ("a judge may not punish a defendant for refusing to confess before sentencing" as it is "impermissible [to] enhance[] a defendant's punishment for his exercise of a constitutional right"). "Indeed, if a prisoner's failure to acknowledge guilt alone were to suffice to support a denial of parole, a prisoner wrongfully convicted of murder

---

[41] The commissioner's passing reference to the plaintiff "never agree[ing] with the facts of his conviction" does not invalidate the other, more prevalent factors discussed throughout the decisions.

. . . might never be paroled unless he or she falsely accepted responsibility for a crime he or she never committed." Deal, supra at 470. Nonetheless, the commissioner may consider a petitioner's acceptance and acknowledgement of the facts of his or her conviction in determining whether he or she will pose a public safety risk on release, as suggesting some level of reform or personal growth. See Mills, supra at 400 n.9 ("a defendant's willingness to admit guilt is a proper factor for consideration in more lenient sentencing").

The facts of the plaintiff's conviction in the present case, notwithstanding its age, are a particularly important factor to consider where he shot a stranger in the head with a firearm from less than six inches away in the course of an armed robbery. McCauley, 391 Mass. at 699. Even though his medical condition likely would make it much more difficult to commit a crime of this nature, it is not such that it would render him incapable of using a firearm to kill another, or incapable of committing various other crimes.

The plaintiff also points to the fact that, since he has been prescribed oxycodone and morphine, he has not had any disciplinary reports for illicit drug use. That the plaintiff no longer is consuming unprescribed medication does not alleviate completely the danger of his drug dependence. It is fair to assume that if he is granted medical parole, his

consumption of pain medication will not be as restricted as in a prison setting.[42]  This is particularly of concern where the record indicates discipline for "accumulating meds."[43]

This is not to say that drug dependence alone, or concerns surrounding illegal drug use, would suffice to suggest a public safety risk or imply that a prisoner would not be able to live and remain at liberty with the law if released.  Nonetheless, in this case, where the plaintiff himself stated at a hearing on a motion to suppress that during the crime he was under the influence of numerous substances, the plaintiff's drug dependence closely relates to the risk that he poses to the public on release, and his extensive disciplinary history surrounding drug activity was an appropriate factor for the commissioner to consider.

Putting that aside, the statute demands release where the prisoner is "permanently incapacitated such that if the prisoner

---

[42] It also bears notice that the plaintiff, in the past (2008), was placed on mental health watch after making a "suicidal gesture" when he, in his own words, was "drunk on straight vodka" while being monitored in prison.

[43] We do not presume that any drug testing that could be ordered by the parole board on release could prevent a public safety risk posed by the plaintiff's substance use concerns.  Of course, drug testing does not prevent an individual from consuming drugs; it merely enables the court or the parole board to remedy a violation after it already has occurred.  It is for the parole board to revise, alter, or amend conditions of release if a prisoner is granted release pursuant to the statute.  G. L. c. 127, § 119A (f).

is released the prisoner <u>will live and remain at liberty without violating the law</u> and that the release will not be incompatible with the welfare of society" (emphasis added).  G. L. c. 127, § 119A (<u>e</u>).  The statute does not require contemplation whether the prisoner will commit the same crime, but, in a more general sense, as discussed <u>supra</u>, requires the commissioner to consider whether the prisoner's condition renders him or her unlikely to violate the law, and whether release would be compatible with the welfare of society.

The plaintiff shot and killed a stranger from within six inches while under the influence of numerous substances. <u>McCauley</u>, 391 Mass. at 699, 701.  He committed this crime while suffering from numbness in his hand.  <u>Id</u>. at 699.  In prison, he has garnered extensive disciplinary reports, including refusing to provide urine, possession of controlled substances and contraband, participating in a drug transaction, accumulating medication, assaulting a correction officer with a food tray, and possession of a weapon.  He suffered from a drug overdose and made a "suicidal gesture" when impaired by alcohol.  Despite his admitted history with substance use concerns, in 2017, he refused to participate in a drug screen recommended to address those concerns.  Although he is permanently incapacitated from a medical perspective, he is able to perform nearly all daily living activities with accommodations.  The above factors

support the commissioner's decision that he would be unable to remain at liberty without violating the law and that his release would be incompatible with the welfare of society, and are proper to be considered on remand along with the risk for violence assessment.

Even so, we think it would be beneficial for the commissioner to be more explicit about the factors considered and her reasoning when making a determination whether to release a prisoner on medical parole. Here, it appears that the commissioner considered the above-mentioned factors, in addition to the plaintiff's medical condition at the time of his conviction, the medical assessment conducted by licensed physicians, the plaintiff's medical parole plan, letters in support of the plaintiff's release, and the opinions of the victim's family and the district attorney's office. The commissioner noted that she was "in receipt" of all the above information, but failed to explain why she concluded that the plaintiff did not meet the requirements of the statute and did not mention the absence of a risk assessment as it relates to meeting the requirements of the regulation. Such an explanation is imperative not only so the prisoner may prepare a relevant response, but also so the court may properly analyze whether the determination is arbitrary or capricious. We urge the

commissioner to prepare a more detailed explanation of her decision going forward.

5. Certiorari review under G. L. c. 249, § 4. Finally, the defendants argue that the court lacks the authority to grant medical parole on certiorari review or to order the commissioner to grant a prisoner medical parole. The plaintiff argues that the court does have this authority, pointing to a handful of Superior Court judges who already have done so and comparing the grant of parole, a discretionary act, to the grant of medical parole, which the plaintiff characterizes as a nondiscretionary act. Although we are remanding the petition for the commissioner to consider a risk for violence assessment to be conducted in accordance with the regulations, we address this issue to provide clarification going forward. Lynn v. Murrell, 489 Mass. 579, 583 (2022).

As is a decision by the parole board to grant parole, "[t]he decision [to grant medical parole] is a discretionary one for the [commissioner] 'with which, if otherwise constitutionally exercised, the judiciary may not interfere.'" Diatchenko II, 471 Mass. at 21, quoting Commonwealth v. Cole, 468 Mass. 294, 302 (2014). Again, the commissioner has the discretion to determine whether the petitioner poses a public safety risk on release: a multifaceted decision considering a wide array of relevant factors. On review pursuant to § 4 of a

decision regarding medical parole, an appellate court or a judge
of the Superior Court does not have the power to substitute its
judgment for that of the commissioner regarding whether a
prisoner merits release on medical parole.  To do so would
"usurp impermissibly the role of the" commissioner and would
violate art. 30 of the Massachusetts Declaration of rights
requiring strict separation of judicial and executive powers.
See Diatchenko II, supra at 28, 30.[44]

   We recognize the plaintiff's assertions that several
Superior Court judges already have taken this action.  This
decision is to be applied to actions in certiorari decided after
the issuance of this decision.  Going forward, judges who review
the commissioner's decision to grant or deny medical parole may
not independently grant or deny medical parole, nor may they

---

[44] In Diatchenko II, the court held in the parole context
that a reviewing court may not reverse a decision by the parole
board even where it finds an abuse of discretion; rather, it
must remand the case to the board for rehearing.  Id. at 31.  In
making this determination, the court addressed the dissent's
concern that "without the affirmative power to grant parole
after a denial by the board, this limited form of judicial
review has the potential to result in an endless cycle of board
hearings and actions for certiorari, until the board ultimately
grants parole."  Id. at 31 n.33.  The court expressed that it
was unlikely this would happen, as such decisions would be rare,
given the deference that is afforded to the board and the
limited scope of judicial review.  Id.  If that were to occur,
the court "assume[d] that at a new hearing, the board [would]
remedy the error or errors that caused the matter to be
remanded."  Id.  We think that a remand to the commissioner in a
medical parole case would follow the same pattern, for the
reasons set forth in Diatchenko II.  Id.

command the commissioner to grant or deny medical parole. Where a judge finds that the commissioner's decision is arbitrary or capricious, such that there is no reasonable ground to support it or because it is not in compliance with the regulations, the judge must remand the petition to the commissioner for reconsideration of the prisoner's petition. A remanding judge should plainly indicate what, within the commissioner's original decision, is arbitrary or capricious or violative of the medical parole regulations, so that the commissioner may squarely address the problem identified by the judge.

Conclusion. Title 501 Code Mass. Regs. § 17.02 does not impermissibly narrow the scope of G. L. c. 127, § 119A, when applied properly by the commissioner. In addition, a judge reviewing a decision granting or denying medical parole may not substitute his or her judgment for the commissioner and order that medical parole be granted. Instead, the proper procedure is to remand to the commissioner for reconsideration consistent with the opinion of the reviewing court. Determining that the commissioner's decision to deny the plaintiff medical parole was arbitrary and capricious because it was made without the benefit of a standardized risk assessment required by the regulation, we remand the matter to the commissioner for reconsideration of the petition and require that a standardized assessment be conducted.

<u>So ordered</u>.

BUDD, C.J. (concurring).  I agree that the regulations concerning the definition of "debilitating condition" as found in 501 Code Mass. Regs. § 17.02 (2019) are valid under the medical parole statute.  I further agree that the matter must be remanded so that the statutorily mandated risk for violence assessment may be completed and taken into consideration.  However, in light of the ordered remand, it is my view that the court should refrain from analyzing the decision of the Commissioner of Correction (commissioner) at this juncture.

As the court acknowledges, at the time of the plaintiff's request for medical parole, 501 Code Mass. Regs. § 17.03(7)(d) (2019), required that an assessment of a petitioner's risk for violence "utilize standardized assessment tools that measure clinical prognosis, such as the LS/CMI [(Level of Service/Case Management Inventory)] assessment tool and/or COMPAS [(Correctional Offender Management Profiling for Alternative Sanctions)], as well as risk level for classification evaluation purposes."  The plaintiff's potential risk for violence is the crux of his appeal; thus, such an assessment would have been particularly relevant to the commissioner's evaluation of the petition.  Nevertheless, the court goes on to analyze in piecemeal fashion the commissioner's evaluation of the information she had at her disposal without regard for the fact that a risk for violence assessment was not a factor in her

decision. Prematurely providing an analysis of the commissioner's decision risks depriving the defendant of an opportunity to have all of the statutorily required factors evaluated in a comprehensive manner because it sends a message that the factors need not be considered in their totality.

Having said that, and keeping in mind that the arbitrary and capricious standard of review requires a rational basis for the commissioner's decision, I note a few areas where the commissioner's decision appears to lack support. First, to the extent that the commissioner relies on the plaintiff's disciplinary history as an indicator of future risk to public safety, I do not see a rational basis to conclude that the plaintiff is unlikely to live without violating the law based on the vague and dated incidents contained in the plaintiff's disciplinary record.[1] The only reported incidents in the record

---

[1] Although it is unclear whether the commissioner gave any weight to the sporadic instances of institutional rule violations (e.g., being out of place in 2007 and showering during an unauthorized time and damaging a mattress in 2016), to the extent she did base her decision on these technical rule violations as indicators of an inability to live within the law, such a conclusion is without rational support. Not only are these instances too old in time to be useful, but even if they were recent, at most they suggest the potential for technical violations of any conditions of release that may be set by the parole board, a process governed separately from the commissioner's responsibility and authority under G. L. c. 127, § 119A (e). See Emma v. Massachusetts Parole Bd., 488 Mass. 449, 458-459 (2021) (parole board has "same authority over medical parolees as it does over standard parolees" and retains

suggesting the potential for violence is an infraction from August 1990, where the plaintiff was found in possession of "an eight and a half inch pick-type weapon" concealed in his mattress. As this infraction was over twenty years ago, it is too stale to be relevant to a decision on the plaintiff's petition.[2] Absent any recent infractions that suggest a current risk for violent or unlawful behavior, the plaintiff's disciplinary report did not contain information to rationally support the commissioner's conclusion that, if released, the plaintiff likely would not live in the community without violating the law. Similarly, the commissioner's reference to the fact that the plaintiff "never agreed with the facts of his conviction," without more, is not specific evidence of likely recidivism.

Requiring the commissioner to base her decision on recent information to assess risk is rational. For example, in the context of the Sex Offender Registry Board (SORB), tasked with "determining the level of risk of reoffense and the degree of

---

discretion "not to initiate revocation proceedings for a 'technical violation'").

[2] The certified record indicates that the plaintiff had a rock on his walker in 2014 and also includes a reference to "assaulting a [correction officer] with a food tray." No further details were provided regarding the latter incident, including the date that it occurred. However, the location of the referenced incident within the record suggests it dates back to the 1980s.

dangerousness posed to the public" for individuals who come before SORB for classification review, G. L. c. 6, § 178K (1), we have stated that "[e]nsuring that a sex offender's final classification reflects a level of risk and dangerousness that is current at a time when the offender's release is imminent furthers both SORB's interest, and that of the public," Doe, Sex Offender Registry Bd. No. 7083 v. Sex Offender Registry Bd., 472 Mass. 475, 488 (2015).  To that end, we have held that information predating SORB's classification consideration by three years is too stale to be reasonably relied on for a determination of risk to public safety.  Doe, Sex Offender Registry Bd. No. 3839 v. Sex Offender Registry Bd., 472 Mass. 492, 501 (2015).  Accord Doe, Sex Offender Registry Bd. No. 6904 v. Sex Offender Registry Bd., 82 Mass. App. Ct. 67, 78 (2012) (risk and recidivism information four years prior to release was stale).  Although the SORB classification process differs in many ways from the medical parole process, the same sound logic as to how to assess rationally present and future risk to public safety applies to both.  This is true especially where the concept of medical parole is premised on "the fact that elderly and infirm prisoners are 'considered among the least likely to re-offend when released.'"  Buckman v. Commissioner of Correction, 484 Mass. 14, 21 (2020), quoting Brownsberger, Extraordinary Medical Release in the Criminal Justice Package

(June 30, 2018), https://willbrownsberger.com
/extraordinary-medical-release [https://perma.cc/K9SJ-MLPW].

Similarly, the plaintiff's disciplinary record indicates that his substance use disorder has been under control for almost a decade.  Thus, to the extent the commissioner relies on this history to conclude that the plaintiff poses a public safety risk, the record offers no rational support for a present or future risk of substance use disorder.  Moreover, reliance on this historical evidence of substance use disorder also ignores the statutory provisions authorizing and directing both the commissioner and the parole board to implement and maintain appropriate supervision conditions, including drug testing.[3]  See G. L. c. 127, § 119A (e), (f).  See also Malloy v. Department of Correction, 487 Mass. 482, 486 & n.9 (2021) (noting that "the parole board must take steps to prepare for adequate supervision of the prisoner," including, but not limited to, "supervision for drugs and alcohol").  Failing to consider an applicable

---

[3] Where the purported concern for this plaintiff is to prevent overuse of medications properly prescribed by a physician, consideration of drug testing as a condition of release may even fall within the Department of Correction's burden to produce a "proposed course of treatment" within the medical parole plan.  G. L. c. 127, § 119A (a).  See Buckman, 484 Mass. at 29.

statutory provision that would ameliorate any potential relapse concerns is arbitrary and capricious.[4]

Finally, because in the medical parole context even a single instance of remand and reconsideration may consume time a petitioner does not have, I urge both the commissioner and any reviewing Superior Court judge to move expeditiously in this process, lest the right to judicial review, and the statute's purpose itself, be rendered illusory by unnecessary delays.  Cf. Malloy, 487 Mass. at 492 ("For terminally ill prisoners entitled to spend their final days in freedom, each day is critical"); Harmon v. Commissioner of Correction, 487 Mass. 470, 478 (2021) (commissioner's "inexplicable delay" in acting on petition for reconsideration "effectively eliminated [petitioner]'s opportunity to seek judicial review before his death").

---

[4] We need not speculate whether the commissioner is aware of the role and purpose of § 119A (e) and (f), as the examples provided postargument show that she has utilized these provisions to condition release in other cases.  Thus, any attenuated concern over the plaintiff's potential for relapse seems patently arbitrary where the commissioner did not avail herself of § 119A (e) or (f) in this case, but did so in others. Cf. Fafard v. Conversation Comm'n of Reading, 41 Mass. App. Ct. 565, 568 (1996) ("agency has acted arbitrarily because the basis for action is not uniform, and, it follows, is not predictable").